1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| I.D., A MINOR, BY AND THROUGH HER PARENTS K.D. AND P.D., <br><br>         Plaintiff, <br><br>  vs. <br><br> SUMNER-BONNEY LAKE SCHOOL DISTRICT, <br><br>         Defendant. | Case No.: <br><br> COMPLAINT FOR JUDICIAL REVIEW AND RECOVERY OF ATTORNEYS' FEES |

Plaintiffs brings this action to appeal the Findings of Fact, Conclusions of Law, and Final Order ("ALJ Decision") entered by Administrative Law Judge ("ALJ") L'Nayim Shuman-Austin on June 13, 2025. This appeal is made pursuant to 20 U.S.C. § 1415(i)(2) and Wash. Admin. Code § 392-172A-05115.

## I.    PARTIES

1.1    Plaintiffs K.D. and P.D. are the parents of minor child I.D. (collectively, "Plaintiffs"). At all times relevant to this action, I.D. resided within the boundaries of the District and attended a District school. To protect the privacy of the minor child at issue, only Plaintiffs' initials are used. The true identities of Defendants are known to all parties.

Cedar Law PLLC
600 1st Ave., Ste. 330, PMB 96563
Seattle, WA 98104
Ph: (206) 607-8277 | Fax (206) 237-9101
elicia@cedarlawpllc.com; lara@cedarlawpllc.com

1.2    Defendant is the Sumner-Bonney Lake School District, a municipal corporation organized under the laws of the State of Washington and located in Pierce County, Washington at 1202 Wood Avenue, Sumner, WA 98390.

## II.    JURISDICTION

2.1    Plaintiffs' claims arise under the Individuals with Disabilities Education Act ("IDEA") 20 U.S.C. §1400 et. seq.; 28 U.S.C. §§ 2201 and 2202; and the state Education for All Act ("State Act") Chapter 28A.13 RCW; and the regulations promulgated thereunder.

2.2    This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1342; 20 U.S.C. § 1415(i)(2)(A); and, as to the state claims, pursuant to pendent jurisdiction.

2.3    Venue in the Western District of Washington at Tacoma is appropriate a pursuant to 28 U.S.C. § 1391 as the District is a municipal corporation located in Pierce County, Washington and a substantial part of the events or omissions giving rise to the claim occurred there.

2.4    This Court has jurisdiction over Plaintiffs' petition for attorney's fees pursuant to U.S.C. § 1415(i)(3).

## III.    FACTUAL ALLEGATIONS

3.1    I.D. is a 14-year old 9th grader with disabilities including Attention Deficit Hyperactivity Disorder ("ADHD"), adjustment order with anxiety, and specific learning disorders in reading (Dyslexia), writing (Dysgraphia), and math (Dyscalculia).

3.2    The time period relevant to this action is I.D.'s seventh grade (2023-2024 school year) and eighth grade (2024-2025 school year) years during which she attended Lakeridge Middle School in the District. I.D. is eligible for special education services under the IDEA disability category of Other Health Impairments and qualifies to receive services in the areas of reading, math, and written expression.

3.3    Plaintiffs initiated an administrative due process hearing regarding the provision of special education services to I.D., which was assigned Office of the Superintendent of Public

Cedar Law PLLC
600 1st Ave., Ste. 330, PMB 96563
Seattle, WA 98104
Ph: (206) 607-8277 | Fax (206) 237-9101
elicia@cedarlawpllc.com; lara@cedarlawpllc.com

Instruction Cause No. 2024-SE-0160 and Office of Administrative Hearings Cause No. 11-2024-OSPI-024050. An administrative hearing was held before ALJ Shuman-Austin on March 24 through 28, 2025.

3.4     The primary issues in the hearing were whether the District violated the IDEA by failing to provide I.D. a free appropriate public education ("FAPE") under the IDEA and whether Plaintiffs were entitled to their requested relief.

3.5     On June 13, 2025, the ALJ issued the ALJ Decision, a copy of which is attached as **Exhibit A**, concluding that the Defendant did not deny I.P. a free appropriate public education and denying Plaintiffs' requested remedies with respect to four of the six issues presented. Among other errors, the ALJ Decision included findings and conclusions that were inconsistent with and erroneous under the IDEA.

3.6     The IDEA provides an appeal of the ALJ Decision as a matter of right. Specifically, 20 U.S.C. § 1415(i)(2)(A) states:

> Any party aggrieved by the findings and decision made under subsection (f) or (k) who does not have the right to an appeal under subsection (g), and any party aggrieved by the findings and decision made under this subsection, shall have the right to bring a civil action with respect to the complaint presented pursuant to this section, which action may be brought in any State court of competent jurisdiction or in a district court of the United States, without regard to the amount in controversy.

3.7     This right to appeal also is set forth in the Washington Administrative Code at Wash. Admin. Code § 392-172A-05115(1), which states:

> Any party aggrieved by the findings and decision made under WAC 392-172A-05105 through 392-172A-05110 or 392-172A-05165 has the right to bring a civil action with respect to the due process hearing request. The action may be brought in any state court of competent jurisdiction or in a district court of the United States without regard to the amount in controversy.

3.8     Plaintiffs bring this appeal pursuant to the above-stated provisions.

3.9     The Parents have accrued and continue to accrue attorney fees and costs through the filing of the action and in their appeal.

---

3 of 5 | COMPLAINT FOR JUDICIAL REVIEW
AND RECOVERY OF ATTORNEYS' FEES

Cedar Law PLLC
600 1st Ave., Ste. 330, PMB 96563
Seattle, WA 98104
Ph: (206) 607-8277 | Fax (206) 237-9101
elicia@cedarlawpllc.com; lara@cedarlawpllc.com

## IV.    CAUSE OF ACTION:

## APPEAL OF THE ADMINISTRATIVE ORDER

4.1    The factual allegations set forth in the above paragraphs are realleged and incorporated by reference.

4.2    The ALJ erred in finding that Defendant provided I.D. with a FAPE. More specifically, the ALJ erroneously found and concluded that the Defendant: did not violate its child find obligations when it did not initiate a special education evaluation until February 1, 2024 (Issue #1); "validly" rejected Parents' requests for specific interventions for I.D.'s dyslexia and dyscalculia (Issue #2); did not violate the IDEA with respect to Issue #3 by, among other errors, failing to consider whether the literacy instruction offered by the Defendant was actually appropriate; and did not violate the IDEA with respect to Issue #5 by, among other things, determining that the Defendant's procedural violations did not result in a denial of FAPE. In rendering her decision, the ALJ, among other errors, failed to properly consider the testimony of witnesses including Plaintiffs' expert, misapplied cited legal authorities, and ignored material evidence.

4.3    The Defendant failed to provide a FAPE to Plaintiff and engaged in procedural violations of the IDEA that acted to deprive the Plaintiff of a free appropriate public education.

4.4    The Defendant violated the IDEA, 20 U.S.C. § 1400 *et seq*., and the federal regulations promulgated thereunder.

4.5    The Defendant violated Chapter 28A.13 RCW and WAC Chapter 392-172A.

4.6    Plaintiffs are aggrieved by the ALJ's Decision are entitled to appeal that decision.

## V.    REQUEST FOR RELIEF

WHEREFORE, Plaintiff requests that this Court:

5.1    Assume jurisdiction of this action, receive the records of the administrative proceedings and hear additional evidence at the request of either party.

Cedar Law PLLC
600 1st Ave., Ste. 330, PMB 96563
Seattle, WA 98104
Ph: (206) 607-8277 | Fax (206) 237-9101
elicia@cedarlawpllc.com; lara@cedarlawpllc.com

1    5.2    Enter a declaratory judgment that the Defendant has denied I.D. a FAPE under the

2  IDEA and state law;

3    5.3    Reverse the erroneous findings and conclusions from the administrative

4  proceeding;

5    5.4    Order the Defendant to provide remedies as originally requested by Plaintiffs;

6    5.5    Award Plaintiffs with their costs and reasonable attorney fees for the

7  administrative proceeding, and any additional fees incurred pursuing this appeal (including costs

8  for redaction of the administrative record if not done by the Office of the Superintendent of

9  Public Instruction), and this action to enforce her rights to a fee award, pursuant to 20 U.S.C. §

10  1415(i)(3)(B) and WAC 391-172A-05120; and

11    5.6    Any and all other relief as the Court may deem just and equitable.

12

13  Dated this 28th day of August 2025.

14

15  s/ Lara Hruska                          s/ Elicia Johnson

16  _____             _____
    Lara Hruska, WSBA No. 46531             Elicia Johnson, WSBA No. 50969
    Cedar Law PLLC                          Cedar Law PLLC
17  600 1st Ave., Ste. 330, PMB 96563       600 1st Ave., Ste. 330, PMB 96563
    Seattle, WA 98104                       Seattle, WA 98104
18  (206) 607-8277                          (206) 607-8277
    lara@cedarlawpllc.com                   elicia@cedarlawpllc.com
19  Attorney for Plaintiff                  Attorney for Plaintiff

20

21

22

23

24

25

Cedar Law PLLC
600 1st Ave., Ste. 330, PMB 96563
Seattle, WA 98104
Ph: (206) 607-8277 | Fax (206) 237-9101
elicia@cedarlawpllc.com; lara@cedarlawpllc.com



**Exhibit A**

**WASHINGTON STATE**
**OFFICE OF ADMINISTRATIVE HEARINGS**

| | |
|---|---|
| In the matter of: | Docket No.   11-2024-OSPI-02405 |
| | **FINDINGS OF FACT,** |
| Sumner-Bonney Lake School District | **CONCLUSIONS OF LAW,** |
| | **AND FINAL ORDER** |
| | Agency:      Office of Superintendent of |
| | Public Instruction |
| | Program:    Special Education |
| | Cause No.   2024-SE-0160 |

A due process hearing was held before Administrative Law Judge (ALJ) L'Nayim Shuman-Austin on March 24, 25, 26, 27 and 28, 2025, via videoconference. The Parents of the Student whose education is at issue[1] appeared and were represented by Elicia Johnson and Rachel Sugar, attorneys at law. The Sumner-Bonney Lake School District (District) was represented by Susan Winkelman, attorney at law. Also present for the District was Abigail Westbrook, District General Counsel, and Karen Finigan Executive Director of Special Services.

<u>STATEMENT OF THE CASE</u>

**Procedural History**

The Parent filed a due process hearing request (Complaint) on November 7, 2024. The matter was assigned to ALJ Shuman-Austin on November 7, 2024. On November 18, 2024, the Parents filed a Motion for Stay Put. The District filed a response on December 4, 2024. A motion hearing was held on December 11, 2024, and an Order on Stay Put was issued on December 13, 2024. A prehearing conference was held on December 19, 2024, and the hearing was set for March 24-28, 2025. The hearing was held as scheduled.

**Due Date for Written Decision**

The due date for a written decision in this matter is June 22, 2025.

---

[1] To ensure confidentiality, names of parents and students are not used. Both parents in this case are referred to as "Parents," unless otherwise indicated below.

Findings of Fact, Conclusions of Law, and Final Order
Cause No.  2024-SE-0160
Docket No. 11-2024-OSPI-02405
8612 - OSPI
Page 1

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA  98504-2489
(800) 845-8830
(206) 587-5135

## EVIDENCE RELIED UPON

**Exhibits Admitted:**[2]

District's Exhibits: D1-D27

Parents' Exhibits: P1-P11, P13-16, P19, P25, P33-P41, P45, P47, P49-P54

**Witnesses Heard:**

Karen Finigan, Executive Director of Special Services, District

Paul Kelly, School Psychologist, District

Sherren Gonzales, Learning Specialist, Lakeridge Middle School, District

Morgan Schumacher, Learning Specialist, Lakeridge Middle School, District

Kristina Palagruti, Behavior Family Support Specialist, District

Ms. Parent

Kelcie Greer, General Education Teacher, Lakeridge Middle School, District

Paul Campbell, General Education Teacher, Lakeridge Middle School, District

Brandi Blaylock, M.Ed., CALT, LDT, Dyslexia Therapist

Melanie Hewett DeAeth, M.Ed, CALT, Dyslexia Therapist

Melissa Espino, MA, M.Ed., CALT, QI, Dyslexia Therapist

Dr. Tammara Bode, Mindful Therapy Group

Tamera Gittens, LMHC Black Space Therapy

## ISSUES

Whether the District violated the Individuals with Disabilities Education Act (IDEA) and denied the Student a free appropriate public education (FAPE) by:

1. Failing to evaluate the Student for an Individualized Education Program (IEP) after the Parent requested the District to evaluate the Student the Summer of 2023 based on an outside private evaluation;

---

[2] Exhibits are cited by party ("P" for Parents; "D" for District), exhibit number, and page number. For example, a citation to P1 at 5 is to the Parent's Exhibit 1 at page 5. The hearing transcript is cited as "Tr." with references to the page of the cited testimony. For example, a citation to Tr. 80 refers to testimony at page 80 of the transcript.

2. Failing to consider the Parents' Spring 2024 request for a specific intervention to address the Student's specific learning disability (dyslexia and dyscalculia);

3. Failing to provide the Student with an evidence-based, multisensory, structured literacy program for students with dyslexia, in any IEP, and implement it with fidelity;

4. ~~Failing to provide the Student with an evidence-based program for students with dyscalculia in any IEP, and implement it with fidelity,[3]~~

5. Failing to offer appropriate SDI in the Student's October 2024 IEP that was reasonably calculated to confer meaningful educational benefit to the Student by failing to appropriately consider or adopt the evaluative data and recommendations of Dayspring Behavioral Health/Dr. Tammara Bode.

6. Failing to offer appropriate SDI in the Student's April 2024 IEP that was reasonably calculated to confer meaningful educational benefit to the Student by failing to appropriately consider or adopt the evaluative data and recommendations of Dayspring Behavioral Health/Dr. Tammara Bode.

7. Failing to offer appropriate SDI in the Student's May 2024 Amended IEP that was reasonably calculated to confer meaningful educational benefit to the Student by failing to appropriately consider or adopt the evaluative data and recommendations of Dayspring Behavioral Health/Dr. Tammara Bode.

And, whether the Parents are entitled to their requested remedies:

1. Declaratory relief finding that the District violated the IDEA;

2. Declaratory relief finding that the Student was denied FAPE by the District's actions;

3. Compensatory education for Student to allow her to obtain the educational benefit that she would have received but for the District's violations of the IDEA;

---

[3] The Parents withdrew Issue #4 on the record on March 28, 2025.

4. An IEP that is reasonably calculated to facilitate meaningful educational progress;

5. Reimbursement for any private evaluations and tutoring for the Student over the past two years;

6. Prospective private placement at District expense in an appropriate evidence-based multisensory, structured literacy program taught with fidelity by trained and qualified staff; and

7. An Order that includes whatever additional relief the court may find just and equitable.

## FINDINGS OF FACT

In making these Findings of Fact, the logical consistency, persuasiveness and plausibility of the evidence has been considered and weighed. To the extent a Finding of Fact adopts one version of a matter on which the evidence is in conflict, the evidence adopted has been determined more credible than the conflicting evidence. A more detailed analysis of credibility and weight of the evidence may be discussed regarding specific facts at issue.

Some of the evidence presented was hearsay, which is a statement made outside of the hearing used to prove the truth of what is in the statement. In administrative hearings, hearsay evidence is admissible if, in the judgment of the presiding officer, "it is the kind of evidence on which reasonably prudent persons are accustomed to rely in the conduct of their affairs." Revised Code of Washington (RCW) 34.05.452(1). An ALJ may not base a finding of fact exclusively on hearsay evidence unless the ALJ determines that doing so "would not unduly abridge the parties' opportunities to confront witnesses and rebut evidence." RCW 34.05.461(4). To the extent any findings of fact are based on hearsay, it is determined that such findings did not unduly abridge the parties' opportunity to confront witnesses and rebut evidence.

### The Student

1.    The Student is fourteen years old. D1 at 3. The Student was diagnosed with anxiety and selective mutism at age 5, and received early counseling to address these diagnoses. D34 at 1; P50; Tr. 248-249, 408-409, 545 (Ms. Parent). Between kindergarten and 5th grade, the Student attended a private school. D34 at 2; P54 at 2; Tr. 248 (Ms. Parent). The Parents have no information about the methods of instruction, types of curriculum, or any learning interventions provided by the private

Findings of Fact, Conclusions of Law, and Final Order
Cause No. 2024-SE-0160
Docket No. 11-2024-OSPI-02405
8612 - OSPI
Page 4

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA 98504-2489
(800) 845-8830
(206) 587-5135

school, and do not recall any of her teachers reporting any concerns with her reading, written language or math skills. Tr. 249-250, 546-547 (Ms. Parent).

2.      In 6th grade, the Student was homeschooled by a teacher from her private school until April 2023, when the teacher expressed concerns that it was becoming harder to teach the Student and that there were issues she was unable to address. Tr. at 250-251, 410-411 (Ms. Parent). The Parents thereafter homeschooled the Student with workbooks and online classes through Kahn Academy. Tr. at 252 (Ms. Parent); D2 at 5.

3.      At the beginning of the 2023-2024 school year, the Student enrolled and began attending 7th grade at Lakeridge Middle School (Lakeridge) in the District. D1; Tr. 248, 411 (Ms. Parent). The Student is enrolled at Lakeridge as an 8th grader for the 2024-2025 school year. D15.

<u>August 2023 – Neuropsychological Evaluation</u>

4.      On August 3, 2023, prior to the Student's enrollment at Lakeridge, the Parents hired Dr. Tammara Bode, Psy.D,[4] at Dayspring Behavioral Health (Dayspring), to conduct a private neuropsychological evaluation of the Student. P34; Tr. 593 (Bode); Tr. 617 (Ms. Parent). Dr. Bode assessed the Student on August 3, 2023. P34; Tr. 596-570 (Bode). Dr. Bode also met with Parents on August 17, 2023, to discuss the results of the evaluation. P34a; Tr. 606 (Bode); Tr. 416, 617 (Ms. Parent).

5.      Dr. Bode left Dayspring for one year between August 2023 and July 2024. Tr. 570-571 (Bode). After she left Dayspring, the organization finalized a School Neuropsychological Evaluation based on Dr. Bode's evaluative data from her August 3, 2023 assessment (August 2023 Dayspring Evaluation), and a separate written report based on her August 17, 2024 meeting with the Parents (August 2023 Dayspring Report). P34; P34a; Tr. 593-595 (Bode). Dr. Bode confirmed that the August 2023 Dayspring Evaluation contained her initial data and notes, and that all the testing and diagnostic information in the evaluation was correct. P34; Tr. 593-595, 603-604 (Bode). Dr. Bode also confirmed that the August 2023 Dayspring Report accurately contained her diagnoses of the Student. P34a; Tr. 606-608 (Bode).

---

[4] Dr. Bode received a Bachelor of Science in Psychology, a Master's in Sport Psychology, and a Psy.D in Counseling. P33; Tr. 569-571 (Bode). Between August 2023 and July 2024, Dr. Bode completed a post-doctoral fellowship focusing on pediatric assessments for neurodevelopmental disorders, academics, mood disorders, and other neuro cognitive conditions including concussions. *Id.* She currently works at Dayspring and also has her own business. *Id.*

6.      Dr. Bode assessed the Student over one day, and interviewed the parents, but did not conduct any classroom observations outside the clinic or interview any of the Student's prior teachers. P34; P34a; Tr. 596-570 (Bode). The Student reported that she enjoyed school and reading. P34 at 4. Dr. Bode administered the Weschler Intelligence Scale for Children, Fifth Edition (WISC-V) the Kaufman Test of Educational Achievement, Third Edition (KTEA-3), the Behavior Rating Inventory of Executive Function, Second Edition (BRIEF2), the Wide Range Assessment of Memory and Learning-3 (WRAML3) and the Integrated Visual and Auditory Continuous Performance Test, Second Edition (IVA-2). P34 at 2, 11-13; Tr. 597 (Bode). The Student also completed self-assessment scales in the Behavior Assessment System for Children, Third Edition (BASC-3). P34 at 11.

7.      On the KTEA-3, the Student received a Silent Reading Fluency score of 95 (At Expected), a Writing Fluency score at 77 (Below Expected), and a Math Fluency score at 91 (At Expected). P34 at 14. The Student received a Reading Composite of 82 (Slightly Below Expected), with sub scores in Letter and Word Recognition of 91 (At Expected), and Reading Comprehension of 78 (Below Expected). P34 at 16. The Student received a Written Language Composite of 89 (Slightly Below Expected), with sub scores in Written Expression of 110 (At Expected) and Spelling at 71 (Below Expected). *Id.* The Student also received a Math Composite of 79 (Below Expected), with sub scores in Math Computation of 89 (Slightly Below Expected), and Math Concepts and Applications of 73 (Below Expected). P34 at 17.

8.      The August 2023 Dayspring Evaluation reflected that the Student received a full scale IQ score of 91 (Average). P34 at 14-15. The Student self-reported at-risk scores on the BASC-3, and received a mildly elevated score on one sub-score of the BRIEF2. P34 at 11, 13. The Student also scored below expected and below average on several subtests on the WRAML3 and the IVA-2. P34 at 11-13.

9.      Dr. Bode diagnosed the Student with Attention Deficit Hyperactivity Disorder (ADHD), Adjustment disorder with anxiety, Specific Learning Disorder in Reading (Dyslexia), Specific Learning Disorder in Written Expression (Dysgraphia) and Specific Learning Disorder in Math (Procedural Dyscalculia). P34 at 16, 17, 18; P34a; Tr. 583-586 (Bode).

10.     Neither the August 2023 Dayspring Evaluation, nor the August 2023 Dayspring Report, recommended any specific type of literacy or writing instruction for the Student, or specified that the Student should receive dyslexia-focused curriculum. P34; P34a. Instead, the August 2023 Dayspring Report included 10 ½ pages from a "template bank" of school recommendations. P34a at 2-13; Tr. 607-608 (Bode). Dr.

Findings of Fact, Conclusions of Law, and Final Order
Cause No. 2024-SE-0160
Docket No. 11-2024-OSPI-02405
8612 - OSPI
Page 6

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA 98504-2489
(800) 845-8830
(206) 587-5135

Bode had not narrowed down this list to make recommendations specific to the Student, but did not disagree with any of them. *Id.*

11.    The August 2023 Dayspring Evaluation noted that the student was "an appropriate candidate for a [sic] 504 accommodations in school." P34 at 19. The August 2023 Dayspring Report specified that the Student was "an appropriate candidate for an Individualized Education Program (IEP)."  P34 at 2. The report specified that the "[Student] may benefit from a reading, writing and mathematics intervention program that is administered 4-5 days per week for a minimum of 40-45 minutes per day," but also specified that she "would benefit from targeted math instruction administered 4-5 days per week for a minimum of 20-30 minutes per day." P34a at 2, 6.

12.    Regarding the Student's reading, the report further specified that "[Student] has potential to make adequate strides in reading provided she has access to specific targeted reading intervention programs that hit all five pillars of the early reading process (phonemic awareness, phonics, fluency, vocabulary and comprehension)." P34a at 4. The report indicated the Student's reading/writing intervention could take the place of her language arts class "given the amount of time her intervention may entail." P34a at 5. The report further noted that the Student "would benefit most from using multiple intervention strategies that improve her speed and fluency, develop vocabulary knowledge, and teach more strategies for comprehension," including natural reading opportunities, computer pacing, multisensory mastery to help with phonics instruction (decoding), phonological flashcards, and audio books. *Id.* The report recommended several books on dyslexia for the Parents and the Student, but did not recommend any specific curriculum, the Orton-Gillingham method, or any other dyslexia-based curriculum. P34a.

## 2023–2024 SCHOOL YEAR

### August - October 2023 – Special Education Referral

13.    On August 28, 2023, the Parents emailed Paul Kelly,[5] the District's School Psychologist, a copy of the August 2023 Dayspring Report which contained Dr. Bode's

---

[5] Dr. Kelly earned a Bachelor's degree in Special Education with a teaching certificate (K-12), a Master's degree in Education with an emphasis in special education, a specialist degree in Educational Diagnostics, and is a Washington state licensed school psychologist. Tr. 208-209 (Kelly). He has worked as a licensed school psychologist for 25 years, and has a permanent teaching certificate (K-12). Tr. 209 (Kelly). Mr. Kelly currently works as a school psychologist at Lakeridge, and has served in that position for 2 years. Tr. 209-210 (Kelly).

diagnoses, and the 10 ½ pages of school recommendations. P34a; P54 at 3; Tr. 225-227 (Kelly); Tr. 617 (Ms. Parent). The Parent also requested to schedule an IEP meeting for the Student. Tr. 414 (Ms. Parent).

14.     On September 5, 2023, the first day of school, Mr. Kelly confirmed he had received the report and requested a copy of the evaluation which resulted in the Student's diagnoses. D27; P54 at 3; Tr. 226-227 (Kelly). Mr. Kelly also sent the Parents a Notification of Special Education Referral.[6] D1. On September 7, 2023, the Parents informed Mr. Kelly that the Student was home schooled the prior year, and before that she had attended private school since kindergarten. P54 at 2.

15.     On September 19, 2023, the Parents sent Mr. Kelly a copy of the August 2023 Dayspring Evaluation. P54 at 1-2; P34. Mr. Kelly then sent another Notification of Special Education Referral, rescheduling the meeting for October 5, 2023. D2; Tr. 210 (Kelly).

16.     The referral reflected that the Student had not previously attended public school, and had not received any interventions to address academic concerns in the private school setting. D2 at 2-33; Tr. 214-215 (Mr. Kelly). The referral noted that the Student was currently earning a D in ELA 7, and that she struggled with writing, but that her struggles with ELA were not uncommon for early 7th grade students. D2 at 3, 5; Tr. 216, 229 (Kelly). The referral further reflected that the Student was earning a C in Math 7 and was receiving a Pass in her Math Intervention class, a smaller group class that retaught core instruction with added scaffolding for math skills. D2 at 3; Tr. 213 (Mr. Kelly). The Student's teachers reported no concerns with anxiety or the Student being resistant to attending classes. D2 at 3; Tr. 213 (Mr. Kelly).

17.     The District guidance team met on October 5, 2023. D2 at 3. There is no record of who attended this meeting. D2. However, meeting minutes indicate the Student was earning an F in ELA 7, and was struggling to retain learned information in the class. D2 at 8. The Student was earning a D in Math 7 and was still enrolled in Math Intervention for reinforcement of Math 7 curriculum, but her math teacher was concerned with her ability to complete grade level content and retain learned content. *Id.* The Student was earning a C in Science, and her written work was very low with many misspellings and lack of conventions. *Id.* All teachers noted that the Student consistently earned low and failing grades in unit quizzes, that she had little

---

[6] The referral mistakenly included a meeting date of September 5, 2023, the same day it was sent. D1 at 1. The Parents and District did not meet until October 5, 2023. D2.

experience taking more comprehensive assessments, did not know how to study for the tests, and that she voiced anxiety over taking tests. *Id.*

18.     Paul Campbell[7] taught the Student's 7th grade general education ELA class with 24-25 other students. Tr. 322-323 (Campbell). During the first two weeks of the school year, students spent time getting to know each other, and began the first ELA unit on narratives during the third week. Tr. 320-321 (Campbell). This class uses the general education ELA curriculum "Collections", which is aligned to Washington State 7th grade standards, and includes reading and writing narrative essays, argumentative writing, and informational writing with science or informational text. *Id.* The class does not include any instruction in decoding or reading instruction. *Id.* Mr. Campell recalled that the Student was a hard worker and raised her hand a lot, but struggled with identifying information in text and writing. Tr. 323-324 (Campbell). As compared to other students, Mr. Campbell observed that the Student's reading and writing abilities were below average. *Id.* However, he also observed that the Student had no resistance or anxiety in going to class. Tr. 324-325 (Campbell).

19.     As a school psychologist, when Mr. Kelly receives a special education referral he looks at the student's school history, attendance record, the consistency of the student's education, and any prior interventions which may have been used for a student. Tr. 210-212 (Kelly). Mr. Kelly initiates a special education evaluation if, based on review of this information, he suspects the student has a handicapping condition which adversely impacts access to core instruction and requires specially designed instruction (SDI). Tr. 211 (Kelly).

20.     Mr. Kelly made the decision not to refer the Student for a special education evaluation after determining the District had no information regarding either the consistency of the Student's prior education, or the existence or effectiveness of any prior interventions that would indicate it was time to move to a special education evaluation. Tr. 210-211, 215-216 (Kelly). Mr. Kelly noted that the Student had a period of time during the prior year when she received no instruction, or only online instruction in math. Tr. 216 (Kelly). As school had only been in session for a few weeks, Mr. Kelly concluded that he needed more information about interventions in the school setting, and the possible need for SDI, before he could initiate a special education evaluation. Tr. 230-232 (Kelly).

---

[7] Mr. Campbell has a Bachelor's degree in English with a Washington State teaching certificate (grades 4-12), and a Master's degree in Education with a physical education/health certification. Tr. 318-319 (Campbell). He has 27 years of experience as a teacher, and teaches 7th grade ELA and 1 PE class at Lakeridge. *Id.*

21.     On or around October 12, 2023, Mr. Kelly informed the Parents that the District would not move forward with a special education referral or evaluation. D2 at 5-6; P54 at 1. A Prior Written Notice (PWN) dated October 12, 2023, stated "[a]t this point in the year we do not have enough information to determine that current interventions are not sufficient to help [Student] access core instruction." D2 at 5.

22.     Instead, Mr. Kelly recommended a 504 plan for the Student which would provide her with classroom accommodations rather than special education services. P54 at 1; Tr. 233 (Kelly); Tr. 416 (Ms. Parent). The Parents understood from Mr. Kelly that the District wanted time to see how the Student would perform without an IEP. Tr. 417 (Ms. Parent). On October 12, 2023, the Parents agreed to pursue a 504 plan for the Student. P54 at 1. On October 26, 2023, the Parents signed a consent to evaluate the Student for a potential 504 plan. D3 at 1.

23.     On October 27, 2023, the District approved a 504 plan which included several accommodations including, but not limited to, breaking down assignments into manageable chunks, visual cues or written directions for work, copies of notes, shortened or modified tasks, and access to text to speech and speech to text on assignments and assessments. D3 at 5-6. /the 504 team noted that the Student had difficulty with reading and writing, but when asked to slow down and picture her answers she had more success. D3 at 2. The District outlined the Student's technology accommodations in an Assistive Technology Collaboration Summary dated November 1, 2023. D4. The Student remained enrolled in the Math intervention class. D25; Tr. 550 (Ms. Parent).

<u>January 2024 – Special Education Evaluation</u>

24.     During the 1st quarter of the 2023-2024 school year, the Student earned a C in ELA, C- in Math 7 and a P in Math Intervention, a D in Social Studies, and a D+ in Science. D25. Statewide Measures of Academic Progress (MAP) Testing for Winter 2023-2024 reflects that the Student received a 7th grade Math score of 207 (17th percentile), and a Reading score of 201 (16th percentile/Lexile 710) which reflected a reading level of 3rd to 4th grade. P47; D5 at 3-4.

25.     On or around January 30, 2024, the Parents again requested a referral for a special education evaluation. D6 at 3. Mr. Kelly reviewed the Student's grades and MAP testing, which indicated that the Student struggled with writing complete and elaborated sentences using accurate convention, and struggled with retaining math information, and had gaps in grade level concepts. D5 at 3-4; P47; Tr. 234-23 (Kelly). Mr. Kelly also reviewed input from the Student's teachers, and noted that she was not making academic progress despite her 504 accommodations and math intervention

class. *Id.* Based on his review, Mr. Kelly concluded an initial evaluation for special education would be appropriate. D5 at 3-4; Tr. 217-218 (Kelly).

26.    On February 1, 2024, Mr. Kelly sent the Parents a Notification of Special Education Referral. D5. The Parent signed consent for the special education evaluation on February 7, 2024. D5 at 6; Tr. 417-418 (Ms. Parent).

27.    On February 21, 2024, the Parents provided background information for the evaluation, indicating that the Student had difficulty with testing due to her ADHD, dysgraphia, dyslexia and procedural dyscalculia. P50. The Parents specified that the Student was diagnosed and treated for selective mutism when she was 5 years old. *Id.*  The Parents also indicated that the Student was seeing a private counselor every other week, and taking the medications Prozac, Concerta and Guanfacine. *Id.*

28.    On February 29, 2024, Mr. Kelly administered the Woodcock-Johnson IV, Tests of Achievement (WJ-IV). D6 at 12; Tr. 218 (Kelly). Mr. Kelly reviewed Dr. Bode's cognitive testing (WISC-V) from August 2023, BASC-3 forms completed by the Parents and teachers, the Student's reported medical history and other information from the Parents, teacher input, and school academic testing. D6 at 7-11; Tr. 218-219, 237 (Kelly).   Mr. Kelly further noted that the Student had received a private neuropsychological evaluation from Dr. Bode which diagnosed her with ADHD and specific learning disabilities in the areas of reading, written expression and mathematics, and adjustment disorder with anxiety. P6 at 3, 7.

29.    Regarding the Student's reading skills, the WJ-IV reflected that the Student received "Low Average" scores in Basic Reading (84), Reading Comprehension (79) and Reading Fluency (88). D6 at 12; Tr. 221-222, 238, 241-242 (Kelly). The evaluation reflected that the Student struggled with decoding digraphs and blends in common words, had trouble with digraphs in nonsense words, and struggled with the process of breaking the word down into syllables, decoding the syllables, and reconstructing the syllables to read and understand passages. *Id.* The evaluation further noted that as passages became longer and more complex, the Student was unable to read and understand some of the more complex words independently to understand the meaning of the text. *Id.*

30.    Regarding the Student's written language skills, the WJ-IV reflected that the Student also received a "Low" Broad Written Language score (77). D6 at 12. The evaluation noted that the Student's difficulties with phonology (digraphs and blends) impacted her ability to spell correctly, and that while she was writing complete sentences they lacked elaboration and detail that would be required at her age. D6 at 13; Tr. 238 (Kelly). The evaluation further noted that the Student struggled to

construct a complete paragraph on her own, and was not demonstrating independent understanding of writing a topic sentence and constructing a paragraph containing sentences that relate to another. *Id.*

31.    Regarding the Student's math skills, the WJ-IV reflected that Student received a "Very Low" Math Problem Solving Score (66). D6 at 12; Tr. 221-222 (Kelly). The evaluation reflected that the Student was missing some foundational math skills, such as reducing fractions, the steps for long division, and the process for solving a basic algebraic equation. D6 at 13; Tr. 239 (Kelly). The evaluation noted that the Student was not firm in her math vocabulary and was unsure when discerning needed from unneeded information in a word problem, although her working memory was well within average ranges. *Id.*

32.    The District's special education evaluation outlined the Student's Winter 2023-2024 MAP scores, and noted that the Student was currently receiving a C+ in Math 7, Pass in Math Intervention, C+ in Social Studies, C in Language Arts, and a D in Science. D6 at 8-9. The Student's math teacher reported that the Student's grade was not an accurate depiction of her mastery of skills, as she received additional scaffolding and time in both her Math 7 and intervention class, and that she was probably more at a D level. D6 at 8; Tr. 240 (Kelly). The Student's Math Intervention teacher reported that she had a lower retention rate and exhibited resistance to instruction. D6 at 8-9. The Student's Science teacher reported that she struggled to understand core content, and that basic knowledge and vocabulary was difficult for her to retain week to week. D6 at 9. Her ELA teacher did not provide any input for the evaluation. D6 at 8-9.

33.    The District's special education evaluation concluded that the Student's diagnosed conditions of ADHD and anxiety impacted the development of skills across the domains of basic reading (decoding), reading comprehension, math problem solving and written expression, and that SDI was warranted in these areas. P6 at 4, 13; Tr. 219-220 (Kelly).

34.    BASC-3 test results from the Parents and teachers reflected that the Student score in the average range of 40-60 in all indexes for social/emotional skills, except for Learning Problems where she scored a 69 in ELA and 62 in Math. D6 at 9-10; Tr. 219-221 (Kelly). None of the Student's teachers reported observing that the Student demonstrated anxiety in their class or resistance to attending class. Tr. 218-219 (Kelly). After  a discussion of evaluation results, classroom participation and team feedback, Mr. Kelly concluded that the Student did not require SDI in the area of social/emotional skills. D6 at 10.

Findings of Fact, Conclusions of Law, and Final Order
Cause No.  2024-SE-0160
Docket No. 11-2024-OSPI-02405
8612 - OSPI
Page 12

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA  98504-2489
(800) 845-8830
(206) 587-5135

35.    The District's special education evaluation recommended the following interventions:

> Reading:
> - Identifying and decoding digraphs and blends commonly found in grade level words
> - Development of sight vocabulary
> - Using context cues to infer meaning within text
> - Answering comprehension questions using evidence from text.
>
> Math:
> - Understanding math vocabulary
> - Identifying the multi step process for solving word problems
> - Solving multi step word problems
> - Solving basic algebraic equations
>
> Writing:
> - Constructing a complete paragraph using accurate conventions (capitalization, punctuation, spelling and grammar)
> - Constructing a logical and well organized essay

D6 at 12-13.

36.    The evaluation team met on April 4, 2024. D6 at 1, 17; D7. The team recommended the following SDI in basic reading, reading comprehension, math problem solving, and written expression:

**Recommendations to IEP (Individual Education Program) committee:**

1. Special Education services including specially designed instruction:

| SDI | Area Assessed | Description |
|---|---|---|
| Basic Reading Skills | Academic | Specially designed instruction for the development of basic reading skills to include but not limited todecodoing blends and digraphs commonly found in words, development of sight vocabulary |
| Reading Comprehension Skills | Academic | Specially designedi instruction for the development of reading comprehension skills to include but not limited t using contextual cues to infer meaning within text, answering comprehension questions using evidence from text. |
| Mathematics Problem Solving | Academic | Specially designed instruction for the development of math problem solving skills to include b utn ot limited to understanding math vocabulary that direct operations within word problems, identifying the multi step process used for solving math word problems, solving multi step word problems, solving basic algebraic equations. |
| Written Language Skills | Cognitive | Specially designed instruction for the development of writing skills to include but not limited to constructing a complete paragraph using accurate conventions, constructing a logical and well organized essay. |

D6 at 5.

Findings of Fact, Conclusions of Law, and Final Order
Cause No.  2024-SE-0160
Docket No. 11-2024-OSPI-02405
8612 - OSPI
Page 13

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA  98504-2489
(800) 845-8830
(206) 587-5135

37.     The District's evaluation did not recommend a specific curriculum, or a specific amount of SDI. Tr. 223, 243 (Kelly). Mr. Kelly noted that Dr. Bode had recommended multiple pages of interventions, but concluded that they were non-specific to the Student and thus did not include them in the evaluation. P34a at 2-6; D6 at 12-13; Tr. 243-245 (Kelly).

38.     A PWN dated April 4, 2024, informed the Parents that the District was proposing to initiate special education services effective April 9, 2024, under the category of "Other Health Impairments," based on her documented diagnosis of ADHD and Anxiety Disorder and a determination that these impairments adversely impacted her access to core instruction in basic reading, reading comprehension, math problem solving, and written expression. D6 at 14; Tr. 418 (Ms. Parent).

## April 2024 Initial Individualized Education Plan (IEP)

39.     On April 5, 2024, the District sent the Parents an invitation to meet to draft an initial IEP on April 19, 2024. D9 at 1-2. On April 17, 2024, Sherren Gonzales,[8] Learning Specialist at Lakeridge and the Student's case manager, e-mailed the Parents a draft IEP and requested they let her know if the Parents had any questions. D8; D9 at 3-22; Tr. 45 (Gonzales). Ms. Gonzales created the draft IEP goals based on the District's special education evaluation and focusing on basic reading, reading comprehension, written language and math problem solving skills. D9 at 8-9; Tr. 47-48 (Gonzales).

40.     Attendees at the April 19, 2024, IEP meeting included the Parents; Ms. Gonzales; Christine Anderson, District Representative, and Traecy McCollum, the Student's Science teacher. D9 at 3; D25 at 2; Tr. 52-53 (Gonzales); Tr. 254, 419 (Ms. Parent). The Student's current Math 7 teacher, Joy Lawless, reported that the Student was currently receiving a C and was a "super hard worker," but there was a big discrepancy between what she think she knew and actually knew, and she had

---

[8] Ms. Gonzales has a Bachelor's degree in both Special Education (K-12) and Early Childhood Education (K-8), and a Master's degree in Curriculum and Instruction.  Tr. 42-43 (Gonzales). Ms. Gonzales has worked as an ELA learning specialist/special education teacher for the past 6 years, received structured literacy training while completing her bachelor's degree, completed GLEAN structured literacy training from the Washington State Office of Superintendent of Public Instruction (OSPI), and completed structured literacy training through the District and OSPI. Tr. 43-45 (Gonzales). The GLEAN training addressed structured literacy teaching for students with dyslexia and dysgraphia, required 4-5 hours per day of asynchronous classes, required comprehension checks and a test, and took an entire summer to complete. Tr. 63-66 (Gonzales). The District dyslexia training addressed how to implement multi-sensory, hands-on teaching methods for students with dyslexia and dysgraphia. Tr. 67 (Gonzales).

difficulty with working memory. P9 at 7. The Student's Math Intervention teacher, T. Wiens, reported that she had a great work ethic, but struggled to retain information. *Id.* The Student's Science teacher, Ms. McCullom, reported that the Student was earning a D, and made generally good effort, but showed a lack of comprehension with basic questions. *Id.* The Student's current ELA teacher, Mr. Campbell, simply reported that the Student was earning a C and provided no other input. *Id.*

41.　　An IEP was developed for the Student for the period of April 26, 2024 through April 25, 2025 (April 2024 IEP). D9 at 3-22. The April 2024 IEP included Mr. Kelly's WJ-IV testing and BASC-3 results, Dr. Bode's WISC-V testing, the Student's reported medical history, Parent information, teacher input, and academic testing. D9 at 5-10; Tr. 46-47 (Gonzales). The April IEP contained one goal in Basic Reading Skills, one goal in Reading Comprehension Skills, two goals in Written Language Skills, and two goals in Mathematics Problem Solving Skills:

**Annual Goal: Basic Reading Skills**

Skill: Blends/Digraphs

By 04/25/2025, when given a set of words containing blends and/or digraphs at the 4th grade level ▉▉▉▉ will identify and decode the words improving decoding skills from undemonstrated (new goal) to 75% accuracy in 2/2 opportunities as measured by in-class observations and work samples

How will progress toward this goal be reported?

[X] Copy of Goal Page　　　　　　　[ ] Written in Report Card　　　　　[X] Written Progress Report
[ ] Other

**Report of Student Progress:** Quarterly

**Annual Goal: Reading Comprehension Skills**

Skill: Inference w/ Text Evidence

By 04/25/2025, when given an informational text at instructional level ▉▉▉▉ will answer inferential questions and provide text evidence to support her answer improving inferencing skills from undemonstrated (new goal) to at least 60% accuracy in 2/3 opportunities as measured by work samples and in-class observation

How will progress toward this goal be reported?

[X] Copy of Goal Page　　　　　　　[ ] Written in Report Card　　　　　[X] Written Progress Report
[ ] Other

**Report of Student Progress:** Quarterly

Findings of Fact, Conclusions of Law, and Final Order
Cause No. 2024-SE-0160
Docket No. 11-2024-OSPI-02405
8612 - OSPI
Page 15

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA 98504-2489
(800) 845-8830
(206) 587-5135

**Annual Goal: Written Language Skills**

Skill: Paragraph Writing

By 04/25/2025, when given an informational writing prompt and a graphic organizer ▉▉▉▉▉ will write a well-organized paragraph with correct conventions improving basic writing and conventions from undemonstrated (new goal) to independently writing a single paragraph with less than 5 errors in 3/4 opportunities as measured by work samples and in-class progress

How will progress toward this goal be reported?

| [X] | Copy of Goal Page | [ ] | Written in Report Card | [X] | Written Progress Report |
|-----|-------------------|-----|------------------------|-----|-------------------------|
| [ ] | Other | | | | |

**Report of Student Progress:** Quarterly

**Annual Goal: Written Language Skills**

Skill: Essay Writing

By 04/25/2025, when given a teacher selected writing prompt and graphic organizer ▉▉▉▉▉ will write a well-organized 3 paragraph essay including an introduction, a body paragraph with details, and a conclusion improving written expression from undemonstrated (new goal) to writing a 3-paragraph essay in 2/3 opportunities as measured by in-class observation and work samples

How will progress toward this goal be reported?

| [X] | Copy of Goal Page | [ ] | Written in Report Card | [X] | Written Progress Report |
|-----|-------------------|-----|------------------------|-----|-------------------------|
| [ ] | Other | | | | |

**Report of Student Progress:** Quarterly

**Annual Goal: Mathematics Problem Solving**

Skill: Multi-Step Word Problems

By 04/25/2025, when given a set of multi-step word problems involving the basic 4 operations ▉▉▉▉▉ will determine the operation and correctly solve the problems improving math problem solving skills from undemonstrated (new goal) to solving with 60% accuracy in 3/4 opportunities as measured by work samples and in-class observation

How will progress toward this goal be reported?

| [X] | Copy of Goal Page | [ ] | Written in Report Card | [X] | Written Progress Report |
|-----|-------------------|-----|------------------------|-----|-------------------------|
| [ ] | Other | | | | |

**Report of Student Progress:** Quarterly

**Annual Goal: Mathematics Problem Solving**

Skill: 1-step equation

By 04/25/2025, when given a set of 1-step algebraic equations involving an unknown variable ▉▉▉▉▉ will correctly set up the problem and solve for the variable improving algebraic equations from undemonstrated (new goal) to correctly solving the equations with 60% accuracy in 3/4 opportunities as measured by in-class observation and work samples

How will progress toward this goal be reported?

| [X] | Copy of Goal Page | [ ] | Written in Report Card | [X] | Written Progress Report |
|-----|-------------------|-----|------------------------|-----|-------------------------|
| [ ] | Other | | | | |

**Report of Student Progress:** Quarterly

D9 at 8-10.

42.     Usually, when a student is two or more grade levels below standard, Ms. Gonzales recommends Developmental ELA or Developmental Mathematics class rather than general education classes. Tr. 51 (Gonzales). In contrast to General Education ELA classes with 26-30 students, Developmental ELA classes contain roughly 8 students receiving special education services, and the general education curriculum is modified. Tr. 137 (Schumacher); Tr. 56-58 (Gonzales); Tr. 295-296 (Greer).

43.     However, the option of receiving SDI in the Developmental ELA and Developmental Mathematics classes was considered and rejected by the IEP team, after the Parents expressed concern that the Student's emotional well-being would be negatively affected by being moved to a separate special education resource room for these services. D9 at 14; Tr. 51-52 (Gonzales); Tr. 420 (Ms. Parent).

44.     The special education and related services matrix provided 30 minutes total SDI per week: 10 minutes/week of SDI for Reading Comprehension, 10 minutes/week of SDI in Basic Reading Skills concurrent with Reading Comprehension, 10 minutes/week of SDI for Written Language, and 10 minutes/week in SDI in Math Problem Solving. D9 at 14. The matrix further specified that all SDI would be provided within the general education setting by an education staff/paraeducator, and monitored by a learning specialist. *Id.*

45.     A PWN dated April 19, 2024, proposed to implement the IEP on May 3, 2024. D9 at 18-19. On or around April 23, 2024, Ms. Gonzales informed the Parents that she would rewrite the PWN to include a list of additional Parent requests which were rejected by the District or approved as accommodations. D10 at 1; Tr. 53-54, 80-81 (Gonzales).

46.     On April 24, 2024, the Parents wrote a letter to Tracy Pitzer, Director of Special Services for the District, and sent a copy to the Principal and Assistant Principal at Lakeridge. P37; Tr. 257, 268-269, 430 (Ms. Parent). In the letter, the Parents reaffirmed their objection to removing the Student from the general education classroom for math and ELA, asserting that this would not be an acceptable first step or a least restrictive environment or an acceptable first step for the Student's first IEP. P37 at 1; Tr. 258 (Ms. Parent). The Parents also requested that the Student receive "[e]vidence-based, multisensory, structured literacy instruction designed for students with dyslexia taught by someone qualified to deliver the program who is fully trained in its use," and "[m]ath instruction by an educator who is educated and trained on dyscalculia." P37 at 2; Tr. 259-260 (Ms. Parent).

47.     Ms. Gonzales did not read the Parent's letter. Tr. 81-83 (Gonzales). However, on April 25, 2024, Ms. Gonzales e-mailed the Parents and  informed them that the District had received and was reviewing their letter. D11; Tr. 82 (Gonzales); Tr. 430-

Findings of Fact, Conclusions of Law, and Final Order
Cause No.  2024-SE-0160
Docket No. 11-2024-OSPI-02405
8612 - OSPI
Page 17

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA  98504-2489
(800) 845-8830
(206) 587-5135

431 (Ms. Parent). Ms. Gonzales also attached the PWN which contained the District's responses to 32 additional requests made by the Parents during the April 19, 2024 IEP meeting, most of which the District rejected, or alternately approved as accommodations. D11; D9 at 11-12, 18-19; Tr. 53-54 (Gonzales); Tr. 422, 430-431 (Ms. Parent).

48.    In the PWN, the District specifically rejected the Parents' request that the school provide "Evidence-based, multisensory, structured literacy program designed for students with dyslexia taught by someone qualified to deliver the program and be fully trained in its use. The program shall be delivered in the scope and sequence intended by its designers, including use of the program's assessments and progress monitoring tools (Barton, Orton Gillingham, etc.)" (Request #13). D9 at 18-19; Tr. 422-423, 425, 551-552 (Ms. Parent). The PWN specified that "[n]either IDEA nor WAC mandates the use of specific branded instructional materials within the IEP" (Response #13). D9 at 19.

49.    The PWN did not mention any request related to dyscalculia, but rejected the Parents' request for a 1:1 or 2:1 math teacher, responding that "[m]ath teachers are certified to teach math to all students." D9 at 18-19; Tr. 549-550 (Ms. Parent).

50.    The District accepted the Parents' proposals that the Student not attend the math intervention class; that reading reflect the scope and sequence of the District's chosen program in annual goals; and that the District specify a mechanism by which goal progress was regularly communicated to all staff delivering reading instruction. D9 at 18-19; Tr. 424 (Ms. Parent).

51.    The District also added as accommodations the Parents' requests that the Student receive as many edits and redo's in ELA as possible without her getting frustrated; use a calculator for everything; receive notes from class in ELA; receive access to speech to text/text to speech in all classes; listen to music on headphones during non-instruction time in class; leave classroom for breaks as needed; no reduction in grades for spelling errors, except on a spelling test; and to receive extended time, multiple or frequent breaks/change of schedule or order of activities. D9 at 11-12, 18-19. The IEP contained additional accommodations including allowing for retakes; use of graphic organizers; breaking large assignments into smaller sections; small group or 1:1 testing; frequent 1:1 checks to ensure understanding of concepts and instruction; providing the multiplication table for state testing; and pre-teaching vocabulary. D9 at 11-12.

52.    On May 22, 2024, the Assistive Technology (AT) team met with the Student for an AT collaboration. The collaboration report reflected that the Student demonstrated

proficiency in using the Snap&Read text-to-speech, line reader and outline/note taking tools. D13 at 3. The Student also demonstrated proficiency in the Co:Writer tool in dictating, but that she preferred to type and not use dictation. *Id*.

53.     On May 28, 2024, the District's attorney responded to the Parents' April 19, 2024 letter. P38. The District asserted that staff who provide the Students SDI were qualified to deliver the instruction and sufficiently trained to implement her IEP. P38 at 2. Referencing RCW 28A.320.260 and various IDEA court decisions, the District further declined the Parent's request that the Student's IEP provider her with an "evidence-based, multisensory, structured literacy program designed for students with dyslexia." P38 at 1-2. To support this decision, the District explained:

> The court in *L.C. [on behalf of A.S. v. Issaquah Sch. Dist.]* explained that, "absent a showing that dyslexia-specific methods are necessary to ensure that a child with dyslexia receives an appropriate education, school districts may lawfully decline to integrate those methods into an IEP. *L.C.*, 2019 WL 2023567, at *22. Here, [Student's] IEP team did not determine that she requires a specific structured literacy program designed for students with dyslexia in order to make appropriate progress on her IEP goals and the general education curriculum. . .

P38 at 3.

## Spring 2024 – Provision of SDI and Student Progress

54.     For the remainder of the 2023-2024 school year, the Student's SDI in math was provided in the general education setting, although she moved out of the math intervention class at her Parents' request. D9 at 19; D10; D25 at 2; Tr. 80 (Gonzales); Tr. 427 (Parent). Ms. Gonzales provided the Student with SDI in basic reading and reading comprehension. Tr. 68 (Gonzales). The Student met with Ms. Gonzales in her office 10 minutes each week, outside the general education classroom. Tr. 69, 79 (Gonzales). During these sessions, Ms. Gonzales would have the Student read a passage out loud, focusing on blends and digraphs, and check the accuracy of the Student's reading. *Id.* The Student would then answer comprehension questions about the text, and Ms. Gonzales would record her progress. *Id.*

55.     Ms. Gonzales understood that the Student was comprehending at a 3rd to 4th grade level and exhibiting difficulty in basic decoding, but also understood that the Parents did not want the Student in a Developmental ELA classroom due to her anxiety and mental health. Tr. 74 (Gonzales). Ms. Gonzales opined that the primary challenge for students with dyslexia is comprehension, because a dyslexic student is

Findings of Fact, Conclusions of Law, and Final Order
Cause No.  2024-SE-0160
Docket No. 11-2024-OSPI-02405
8612 - OSPI
Page 19

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA  98504-2489
(800) 845-8830
(206) 587-5135

working so hard on decoding words and phrases that they cannot comprehend the meaning of the text or passage. Tr. 70-71 (Gonzales). Ms. Gonzales agreed that dyslexic students require more multisensory, hands-on learning, and more practice on breaking down the language. Tr. 69-70 (Gonzales).

56.     On May 10, 2024, the IEP was amended solely to remove the accommodation of small group or 1:1 testing after the Parents additionally requested that the Student not be pulled from the general education setting for testing (May 2024 Amended IEP). D12; Tr. 255-256 (Ms. Parent); Tr. 54-55, 83-84 (Gonzales). All other elements of the IEP remained the same. *Compare*, D12 at 8-12, 14; D9 at 8-10, 14; Tt. 55 (Gonzales).

57.     June 2024 IEP Progress Reports reflect that the Student met the IEP Basic Reading goal (Blends/Digraphs at 4th grade level), reaching 75% accuracy in 1 of 2 opportunities. D19 at 2; Tr. 98-99 (Gonzales). However, the Student did not meet any of her other IEP goals. D19 at 2-5. The Student reached only 25% accuracy in the Reading Comprehension goal (Inference with Text Evidence at instructional level); reached 0% accuracy independently, and 50% accuracy with adult assistance in the Mathematics Problem Solving Goal (Multi-Step Word Problems); reached 50% accuracy in the Mathematics Problem Solving Goal (1-step equation); made 10 errors in the Written Language Skills goal of less than 5 errors (Paragraph Writing); and was unable to independently write a well-organized 3-paragraph essay in response to the Written Language Skills goal (Essay Writing). *Id.*

58.     Statewide MAP Testing for Spring 2024 reflected that the Student received a 7th grade Math score of 208 (well below average), and a Reading score of 199 (well below average) which was lower than her Winter 2023-2024 score of 207. P47; D14. On the District Spring 2024 Smarter Balanced Assessment (SBA), the Student scored Level 1 (does not meet grade level expectations) in both ELA and Math. D14; D24.

59.     The school year ended on Tuesday, June 18, 2024. D27 at 1. The Student ended 2nd Semester of 7th grade with a B- in Math 7, C+ in Social Studies, A in Flight and Space, B in ELA, and D in Science. D25 at 2.

## 2024–2025 SCHOOL YEAR

## October 2024 Amended IEP

60.     The 2024-2025 school year began on Tuesday, September 3, 2024. D27 at 3. There is no evidence that the Student received any SDI under the April 2024 IEP at the beginning of the 2023-2024 school year. Rather, on Thursday, September 12, 2024, Ms. Gonzales e-mailed the Parents to set an IEP meeting for October 4, 2024, to discuss how the Student would receive SDI during the 2024-2025 school year. D16 at 2.

Findings of Fact, Conclusions of Law, and Final Order
Cause No. 2024-SE-0160
Docket No. 11-2024-OSPI-02405
8612 - OSPI
Page 20

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA 98504-2489
(800) 845-8830
(206) 587-5135

61.     On September 30, 2024, the District sent the Parents an IEP Amendment Invitation with a draft IEP, setting a meeting for October 14, 2024 at 2:30pm. D15. The purpose of the meeting was to discuss the District's proposal to move the Student to Developmental ELA for reading and writing due to her lack of progress in these areas. D15 at 14; P47; Tr. 55-56, 59, 74-76, 85-86 (Gonzales).The draft IEP included additional minutes of SDI for reading comprehension, basic reading, and written language, all to be provided in Developmental ELA. *Id.*

62.     The IEP team met on October 14, 2024. D15 at 18. Attendees included Ms. Gonzales; Ms. Pitzer; Chris Anderson, Lakeridge Assistant Principal; Ms. Lawless, the Student's general education math teacher; Jeff Losinski, the Student's prior general education Flight and Space teacher; Dianna Meints, the Student's Digital Media general education teacher; and the Parents. D15 at 7, 18-19; Tr. 261, 435-436 (Ms. Parent); Tr. 58-59 (Gonzales).

63.     IEP Meeting notes indicated that the IEP team discussed Statewide MAP Testing for Fall 2024, which reflected that the Student received an 8th grade Math score of 199 (25th percentile/well below average), and a Reading score of 196 (10th percentile/well below average). D14. The Student's reading score was in the 10th percentile and lower than both her Winter 2023-2024 score of 201 and Spring 2024 score of 199. P47. Her math score was in the 25th percentile, and lower than her Spring 2024 score of 208. *Id.*

64.     An amended IEP was developed for the Student for the period of October 22, 2024 through April 25, 2025 (October 2024 Amended IEP). D15 at 3-22. However, the IEP did not include either the Student's Spring 2024 or Fall 2024 MAP scores, or the District's Spring 2024 SBA scores, and simply repeated the same data from the April 2024 IEP, which outlined the Student's Winter 2023-2024 MAP scores. *Compare*, D9 at 5; D15 at 5. The IEP did not include any comments from the Student's current 8th grade teachers about her progress. D15 at 7; D25 at 3. Rather, the IEP copied the comments from her 7th grade teachers outlined in the April 2024 IEP. *Compare*, D9 at 7; D15 at 7. Kelcie Greer, [9] the Student's general education ELA teacher, was not invited to and did not attend the October 2024 IEP meeting. Tr. 305-306 (Greer).

---

[9] Ms. Greer has a Bachelor's degree in Education, a Master's degree in Education, and is certified as an ELA instructor for secondary grades (4-12). Tr. 289-290 (Greer). Ms. Greer has taught 8th grade at Lakeridge for eight years. Tr. 290-291 (Greer). Prior to working at Lakeridge, she taught 6th-7th grade for four years and 10th-11th grade for one year. Tr. 291-292 (Greer).

65.     The October 2024 Amended IEP also did not change any of the prior IEP goals, even the Basic Reading goal which the Student had met in June 2024. *Compare*, D19 at 2; D15 at 8-10. Instead, the IEP increased the Student's SDI in Reading Comprehension to 30 minutes/5 times per week, increased SDI in Basic Reading to 5 minutes/5 times per week to be delivered concurrent with Reading Comprehension, and increased SDI in Written Language to 25 minutes/5 times a week. D15 at 14. The October 2024 Amended IEP also specified that the reading and writing SDI would now be delivered in a special education setting. *Id.* Math SDI remained at 10 minutes per week, to be delivered in the general education setting. *Id.*

66.     The Parents recall attending the October 14, 2024 IEP meeting. Tr. 261 (Ms. Parent). During the meeting, the Parents expressed that they disagreed with the Student receiving SDI in reading and writing in the Developmental ELA class in the special education resource room, explaining there had not been enough time to determine if the District's prior interventions would work. *Id.* The Parents also expressed during the meeting that pulling the Student from her general education class would have negative mental health implications due to her anxiety. Tr. 261-261 (Ms. Parent). The Parents recalled that the Student's general education math teacher disagreed with the move to Developmental Math, but the Student's General Education ELA teacher was not present at the meeting and provided no input about the IEP or delivery of SDI. *Id.* The District thereafter agreed to allow the Student to receive SDI in math in the general education setting, but rejected the Parent's request that she remain in General Education ELA. D15 at 18-19.

67.     A PWN dated October 16, 2024, and e-mailed to the Parents that same day, proposed to implement the IEP on October 22, 2024. D15 at 18-19; D16. The PWN specified that the District rejected the Parents' request that the Student continue to receive SDI in the General Education ELA classroom:

> [Student] has been receiving SDI in the general education classroom; however, the necessary adaptations, individualized methodology, and delivery of instruction cannot be effectively provided in that setting. Classroom data and progress towards IEP goals indicate that [Student] requires more intensive instruction in reading and writing to have a reasonable chance of achieving her annual goals.

D15 at 18.

68.     The PWN noted that the District also considered, but rejected, moving the Student to a special education setting for math, finding that she was making satisfactory progress in math with SDI delivered in the general education classroom.

Findings of Fact, Conclusions of Law, and Final Order
Cause No. 2024-SE-0160
Docket No. 11-2024-OSPI-02405
8612 - OSPI
Page 22

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA 98504-2489
(800) 845-8830
(206) 587-5135

D15 at 18. The PWN further specified that the District rejected the Parents' request that it pay for private after-school tutoring, because the District was able to provide appropriate services outlined in the IEP during the school day as part of the continuum of services. *Id.*

69.     Ms. Greer, the Student's general education ELA teacher, was aware that an IEP meeting had been set, and aware of a discussion about the Student's prior test results and MAP scores, but did not attend the October 2024 IEP meeting and did not participate in the decision making process of the Student's ELA placement. Tr. 305-306 (Greer). Ms. Greer did not ask for the Student to be removed from her general education class. Tr. 304-205 (Greer). Rather, Ms. Gonzales informed Ms. Greer of the decision to move the Student to the Developmental ELA class. *Id.* Ms. Greer could not speak to the Student's academics because the class had not yet begun to focus on grade level standards before the Student was moved into Developmental ELA. Tr. 299-301 (Greer).  However, Ms. Greer recalled that the Student performed well on a beginning of year assignment to write a letter to the teacher. *Id.* Ms. Greer further recalled that the Student was kind, showed respect, and did not exhibit any anxiety during class. Tr. 300-301 (Greer).

## Fall 2024 – Provision of SDI and Student Progress

70.     On Wednesday, October 23, 2024, Ms. Gonzales e-mailed the Parents informing them that the school was working on a schedule change to move the Student into the 4th period resource room/Developmental ELA with Morgan Schumacher,[10] a Learning Specialist. D20 at 6. On or around the same day, the Student texted the Parents, informing them that her ELA class was being switched to 4th period Developmental ELA. Tr. 437 (Ms. Parent).  The Parent e-mailed Ms. Gonzales that she did not consent to the Student being transferred or pulled from any general education class. D20 at 6; Tr. 437 (Ms. Parent).

71.     On Thursday, October 24, 2024, Ms. Pitzer e-mailed the Parents that the District was moving forward with implementing the October 2024 Amended IEP. D20 at 6. She also attached the Notice of Special Education Procedural Safeguards for

---

[10] Ms. Schumacher has a Bachelor of Arts in Special Education (K-12), with a minor in Music. Tr. 113-114 (Schumacher). She currently works as the learning specialist for 7th and 8th grade ELA at Lakeridge. Tr. 114-115 (Schumacher). Ms. Schumacher voluntarily completed GLEAN training from OSPI, which focused on dyslexia, differentiated instruction and multisensory instruction, consisting of four classes of 30-40 minutes each. Tr. 115 (Schumacher). At the beginning of the 2024-2025 school year, Ms. Schumacher also received District training in "95 Percent Surge," a District curriculum which focuses on syllables and what they mean within a word. Tr. 116 (Schumacher).

Students and Their Families. *Id.* Despite their concerns, the Parents encouraged the Student to try the Developmental ELA class. Tr. 440 (Ms. Parent).

72.    The Student attended the Developmental ELA class for only three days. Tr. 262, 440-441 (Ms. Parent). On Friday, October 25, 2024, the Student attended the 4th period Developmental ELA class for the first time. *Id.* The Student experienced a panic attack, and requested the Parents pick her up after class. *Id.* The Parents picked her up after class, and the Student missed the last two periods of school. *Id.* The Student also was unable to leave her mother and did not attend her dance class that evening. *Id.*

73.    On Monday, October 28, 2024, the Student attended the 4th period Developmental ELA class, but again requested that her Parents pick her up after class. Tr. 262, 441-442 (Ms. Parent). Her Parent again picked her up after the class and she missed the last two periods of school. *Id.* Her Parents observed that her mood at home was completely different and her anxiety was higher than when she had started Prozac at age 5. Tr. 441 (Ms. Parent). The Student did not want to go to school, and did not want to attend a school dance with friends, and just wanted to stay home with her mother. *Id.*

74.    On Tuesday, October 29, 2024, the Student attended the 4th period Developmental ELA class, and made it through a full day of school because although the Student requested to be picked up early, her Parents were unable to pick her up. Tr. 262, 441 (Ms. Parent). The Parents recalled that after this third and final class, they struggled to get the Student to leave the house, whether for school, to go to dance class, or spend time with her friends. Tr. 443 (Ms. Parent). The Student often cried and was upset and would text her Parents throughout the day that she could not mentally handle being at school. Tr. 444 (Ms. Parent).

75.    After three days in Developmental ELA, the Parents decided that they would not make the Student attend the class, and that they would instead pick her up during 4th period and return her to school afterward. Tr. 262, 444-445 (Ms. Parent). Between October 30, 2024 and November 13, 2024, the Parents signed the Student out of school during 4th period for "anxiety due to schedule change." D26. During 4th period the Student instead completed homework or other school work at home. Tr. 264 (Ms. Parent).

76.    Ms. Schumacher provided the Student's SDI in the Developmental ELA class during the three days the Student attended. D15; Tr. 122-123, 137 (Schumacher). She teaches three 55-minute Developmental ELA classes with a paraeducator with an average of eight students. Tr. 117, 122-123 (Schumacher). The Student was the fifth student assigned to Ms. Schumacher's 7th – 8th grade Developmental ELA class,

which contained students reading at a 5th – 8th grade level. Tr. 146 (Schumacher); Tr. 108 (Gonzales).

77.    Ms. Schumacher has received OSPI and District training in dyslexia and has experience teaching dyslexic students. Tr. 115-117 (Schumacher). While students in the Developmental ELA class have different IEP goals, most have digraph and blend goals and reading comprehension goals, so Ms. Schumacher works on similar IEP goals with the entire class. Tr. 120, 138 (Schumacher).

78.    During a typical week, students in Developmental ELA start with "Vocabulary Surge" on Mondays, working on multisyllabic words, nonsense words, and identifying open or closed syllables. D15 at 9; Tr. 119-120 (Schumacher). To address reading comprehension, students read stories, discuss content, and Ms. Schumacher tests comprehension. *Id.* Ms. Schumacher also assesses each student's progress with "ReadWorks," a program that assesses each student's level, sets independent goals, and provides reading materials. Tr. 122 (Schumacher). To address written language skills, Ms. Schumacher has students work on sentence stem suggestions and hook suggestions to complete writing, and students use google docs for assignments, checks and progress. D15 at 10; Tr. 120-121 (Schumacher).

79.    On the Student's first day of class, a Friday, the class was finishing up reading one of the stories from the General Education curriculum. Tr. 122 (Schumacher). On the second day, a Monday, the class worked independently on IEP goals, so Ms. Schumacher provided the Student with a "ReadWorks" independent reading goal. Tr. 123-124 (Schumacher). Ms. Schumacher observed that the Student had inconsistencies in reading and comprehension, noting that the Student spent only 5 minutes reading a sample passage and demonstrated only 20% comprehension. *Id.* The Student was then assisted by a paraeducator to re-read the passage, took a longer time to read the passage, and demonstrated 80% comprehension of the passage. *Id.* On the third day, a Tuesday, the class watched a clip of one of the stories they had just read in order to compare different types of media. Tr. 123 (Schumacher).

80.    Ms. Schumacher reviewed the Student's IEP and understood that her goals included working on blends/digraphs, reading comprehension, and written language. Tr. 146 (Schumacher). Ms. Schumacher emphasized that while she only saw the Student for three days, the Student required shortened assignments, shortened text and longer times to complete assignments. Tr. 136 (Schumacher). Ms. Schumacher opined that the Developmental ELA room was the most appropriate placement for the Student in October 2024, because the Student independently read with only 20% comprehension, and performed better with 1:1 support by a paraeducator. Tr. 124 (Schumacher).

81.     On Wednesday, October 30, 2024, Ms. Greer, the Student's previous general education ELA teacher, responded to a Parent e-mail.[11] D17 at 1-2. Ms. Greer indicated that she really enjoyed having the Student in class the past few months, but understood that in order to meet her goals and specific needs, she would benefit from being in a smaller setting with Ms. Gonzales. D17 at 2. The Parent responded, asking her opinion if the Student could be successful while remaining in her class, as Ms. Greer had not been at the IEP meeting. D17 at 1. On November 4, 2024, Ms. Greer responded that she was sorry to hear the Student was struggling with the change, but that any information about how to fulfill the Student's ELA instruction or IEP services would need to go through her current ELA teacher, Ms. Schumacher, or her current case manager, Ms. Gonzales. D18 at 102.

82.     On November 15, 2024, Ms. Gonzales e-mailed the Parents the Student's 1st Quarter IEP Progress Report. D19. The November 2024 IEP Progress Report reflects that the Student again met the IEP Basic Reading goal (Blends/Digraphs at 4th grade level), reaching 95% accuracy and improving from 75% accuracy in June 2024. D19 at 2. However, the Student did not meet any of her other IEP goals. D19 at 2-5.

83.     The Student reached only 20% accuracy in the Reading Comprehension goal (Inference with Text Evidence at instructional level); was unable to independently set the multi-step equation in the Mathematics Problem Solving Goal (Multi-Step Word Problems); was able to independently set up equations at 70% accuracy in the Mathematics Problem Solving Goal (1-step equation); made 10 or more errors without assistance, and 5-8 errors with assistance, in the Written Language Skills goal (Paragraph Writing); and continued to require extensive support throughout each step of paragraph writing and was unable to independently write a well-organized 3 paragraph essay in the Written Language Skills goal (Essay Writing). *Id.*

84.     During the 1st quarter of the 2024-2025 school year, the Student earned a B- in Math 7, F in Developmental ELA, F in Science, A in Automation & Rob, B+ in Digital Media, and A in Skills for Life. D25 at 3. Statewide MAP Testing for Winter 2024-2025 reflected that the Student received an 8th grade Math score of 215 (in the 25th percentile, but higher than her Fall 2024 score of 199). P47 There was no Reading MAP score. *Id.*

---

[11] The content of the prior message is not contained in the record. D17.

<u>November 2024 – Private Dyslexia Assessment</u>

85.     On or around November 9, 2024, the Student received a private virtual assessment from Melanie Hewett DeAeth,[12] M.Ed., Certified Academic Language Therapist (CALT), from Dyslexia on Demand (November 2024 Dyslexia Assessment). P5; P6; P9; Tr. 655-656, 675 (DeAeth). Dyslexia on Demand is a program which provides an evaluation of a student's reading deficits and prescribes reading interventions, including Orton-Gillingham based curriculum and one-on-one tutoring. P9; P10; P11; P13; Tr. 654, 668-669 (DeAeth).

86.     Ms. DeAeth administered the Woodcock Reading Mastery Tests-Third Edition (WRMT-III), the Test of Written Spelling - Fifth Edition (TWS-5), the Phonological Awareness Test – Second Edition (PAT-2), and the Comprehensive Test of Phonological Processing – Second Edition (CTOPP-2). P5; P6; Tr. 656-657 (DeAeth). Ms. DeAeth also reviewed Dr. Bode's assessment, and reviewed the Student's April 2024 IEP and SDI service matrix. D9; P5; P34; P34a; *Id.*

87.     On the WRMT-III, a reading mastery assessment, the Student received Below Average or Low Average in all subtests including Word Identification, Word Attack (reading nonsense words), Word Comprehension, Passage Comprehension, Listening Comprehension and Oral Reading Fluency. P5 at 3; P6; Tr. 658–659 (DeAeth). The WRMT-III reflected that the Student's proficiency was "very difficult" in all these areas. P5 at 3; P6 at 3; Tr. 659-661 (DeAeth). On the TWS-5, a spelling assessment, the Student scored 74 (Below Average), reflecting that she was not familiar with the conventions of the written language and was spelling phonetically rather than with the rules of the English language. P5 at 4; Tr. 661-662 (DeAeth).

88.     The PAT-2 is a phonics assessment usually used to assess students aged 9 or under, and thus raises a red flag if there are deficits for older students. P5 at 4-6; Tr. 662 (DeAeth). On the PAT-2, the Student scored 70% (Below Proficient) in Consonant Blends (cr, fl, spl); 40% (Below Proficient) in R-Controlled Vowels (ar, er, ir); 40% (Below Proficient) in Vowel Digraphs (ea, oa, ai); and 25% (Below Proficient) in

---

[12] Ms. DeAeth is a dyslexia diagnostician and dyslexia tutor, with previous experience as a dyslexia specialist with 23 years in the field. She received a Bachelor of Science in Childhood Education (K-6), a Master's degree in Special Education with a diagnostician certificate, and is a nationally certified Academic Language Therapist (CALT). P3; Tr. 653–655 (DeAeth). Ms. DeAeth has previously worked in public schools in Texas as a diagnostician, dyslexia tutor and reading specialist, and currently works for Dyslexia on Demand as a diagnostician who completes standardized assessments for incoming students. *Id.*

Diphthongs (ou, oi, oy). P5 at 4-5. The Student received an overall Decoding Score of 83%, which was considered "Proficient." P5 at 6; Tr. 662-664 (DeAeth).

89.     On the CTOPP-2, a phonological processing assessment, the Student scored Average in Phonological Awareness and Blending Words, but scored Below Average in Elision (9th Percentile) and Phoneme Isolation (16th percentile), reflecting weaknesses in phonological awareness. P5 at 7; Tr. 664-665 (DeAeth). The Student also scored Very Poor (1st percentile) in Rapid Symbolic Naming, Poor (5th Percentile) in Rapid Digit Naming, and Poor (2nd Percentile) in Rapid Letter Naming, reflecting weak retrieval skills in addition to dyslexia *Id.*; Tr. 665-666 (DeAeth).

90.     The Student's November 2024 scores on the KTEA-3 were very similar to her August 2023 KTEA-3 scores. *Compare*, P5 at 1-2; P34 at 16-17; Tr. 677-678 (DeAeth). The Student received a Silent Reading Fluency score of 95 (At Expected), a Writing Fluency score of 77 (Below Expected), and a Math Fluency score of 91 (At Expected). P5 at 1. She received a Reading Composite score of 82 (Slightly Below Expected), with sub scores in Letter and Word Recognition of 91 (At Expected), and Reading Comprehension of 78 (Below Expected). P5 at 1-2. The Student received a Written Language Composite of 89 (Slightly Below Expected), with sub scores in Written Expression of 110 (At Expected), and Spelling of 71 (Below Expected). *Id.* The Student also received a Math Composite score of 79 (Below Expected), with sub scores In Math Computation of 89 (Slightly Below Expected), and Math Concepts and Applications of 73 (Below Expected). *Id.*

91.     The November 2024 Dyslexia Assessment concluded that the Student had overall deficits in Reading, Writing, and Math, ADHD and dyslexia, and exhibited both working memory and rapid recall deficits. P5 at 8-9; Tr. 666-667 (DeAeth). Among other recommendations, Ms. DeAeth recommended that the Student receive Orton-Gillingham based reading instruction to remediate the Student's reading and comprehension weaknesses, emphasizing that the Orton-Gillingham approach provides a structured literacy program with a direct, explicit, multisensory, and sequential way to teach reading. P5 at 9; Tr. 668-669 (DeAeth). The assessment did not include any specific recommendations regarding reading comprehension or writing. *Id.*

92.     The record does not reflect that the Parents sent the November 2024 Dyslexia Assessment to the District. Nevertheless, the evaluation did not specify that an Orton-Gillingham approach was required for the Student to learn to read. Rather, the evaluation specified that an Orton-Gillingham reading instruction program would "help remediate" the Student's reading and comprehension weaknesses.  D5 at 9.

## November 2024 Therapist Letter

93.    On November 12, 2024, the Parents e-mailed the District a November 10, 2024, letter from the Student's therapist, Tamera Gittens, LMHC.[13] D20 at 5; P36; Tr. 445 (Ms. Parent); Tr. 641 (Gittens); Tr. 100-101 (Gonzales). Ms. Gittens has provided mental health counseling to the Student since 6th grade to address anxiety in her every-day life, and has twice monthly counseling sessions with the Student. Tr. 545 (Ms. Parent); Tr. 640-641(Gittens).

94.    In her letter, Ms. Gittens expressed that in the two weeks since being moved to Developmental ELA in the resource room, the Student had demonstrated increasingly severe anxiety, marked by persistent fear, reluctance to attend school, and a growing sense of dread associated with the classroom environment. P36; Tr. 642 (Gittens). Ms. Gittens expressed that the change in the Student's classroom had affected her mental state to the point where she had lost interest in other activities, including going to her dance class, and that this could indicate the onset of depressive symptoms. *Id.* Ms. Gittens recommended the District immediately review the Student's current placement. *Id.*

## November 2024 - Private Dyslexia Tutoring – Dyslexia on Demand

95.    On or around November 18, 2024, the Student began remote tutoring with Dyslexia on Demand with Melissa Espino,[14] MA, M.Ed., CALT, QI. P52 at 1; Tr. 489 (Espino). Dyslexia on Demand utilizes the "Take Flight" dyslexia reading program, an Orton-Gillingham based curriculum which was developed by Scottish Rite, a Texas hospital with a dyslexia learning center. P9; P10; P11; P13; Tr. 487-488 (Espino). "Take Flight" is a dyslexia structured literacy program, which provides step-by-step instruction in phonics, decoding, reading, fluency, and comprehension. *Id.* The curriculum follows

---

[13] Ms. Gittens is a Licensed Mental Health Counselor (LMHC) through the State of Washington. P35; Tr. 638-639, 645 (Gittens). She received a Bachelor of Arts in Forensic Psychology, a Masters of Arts in School Counseling, and a Masters of Arts in Mental Health Counseling. *Id.* Ms. Gittens has been a LMHC for the past 3 years, currently works as a private therapist, and has previously worked as a school counselor and behavioral health specialist. *Id.*

[14] Ms. Espino earned a Bachelor of Science in Interdisciplinary Studies, a Master's in Educational Leadership, and a Master's in Education with an emphasis in dyslexia. P4; Tr. 485-486 (Espino). Ms. Espino is both a CALT, and a Qualified Instructor (QI) of the Take Flight dyslexia curriculum, and teaches both general education and special education teachers to teach the "Take Flight" curriculum. P9; *Id.* As a CALT, Ms. Espino has completed 200 hours of training, 700+ clinical hours, and is certified and licensed as a therapist in Texas. P9; Tr. 486-487 (Espino).Ms. Espino holds both a teaching certificate and a diagnostic certificate from Texas. *Id.* Ms. Espino currently works for both Dyslexia on Demand, and is also a dyslexia diagnostician for a public school district in Texas. *Id.*

a scope and sequence of concepts, which is spiraled and re-taught throughout the curriculum so students retain concepts. P9; P10; P11; P13; Tr. 490-496.

96.      Prior to tutoring the Student, Ms. Espino reviewed her WJ-IV reading mastery test conducted on November 9, 2024 and the assessment summary completed on November 15, 2024. P5; P6; Tr. 499-500 (Espino). Ms. Espino emphasized that the Student's dyslexia is not severe, and that she is capable of learning to read, but that she requires repetition and extra teaching because she struggles with reading words in isolation and comprehension. Tr. 500-501 (Espino). Ms. Espino further explained that at 8th grade, students are no longer learning decoding and are instead reading to learn content and, that even with tutoring, the Student might never close the gap with her peers because she did not read properly by 4th grade. Tr. 501-502 (Espino).

97.      Since November 2024, the Student has received "Take Flight" tutoring 60 minutes per day, 4 days per week. Tr. 507 (Espino). Ms. Espino explained that students who have difficulty in reading often struggle with confidence, so she focuses on what the Student is doing well. Tr. 503 (Espino). Ms. Espino recalled that the Student was at first very quiet, but is now willing to try to read and break out words and apply what she knows. Tr. 502 (Espino). Ms. Espino noted that as soon as the Student was given rules, she used them. Tr. 504 (Espino).

98.      The "Take Flight" program has seven books of lessons, with mastery checks at the end of each. Tr. 504-505 (Espino). Each session requires a proficiency test before moving onto the next session. *Id.* During each of the Student's tutoring lessons, the Student works on sequence of letters, commonly used words at 5th grade level, spelling, phonetic awareness, and comprehension and inferenced questions. Tr. 506-509 (Espino). The Student has good orthographic memory, and very good general knowledge and vocabulary, and has often memorized how a word should look rather than reading its parts. *Id.*

99.      Dyslexia on Demand is a 2-year program which provides one-on-one tutoring at a rate of $79.75/hour, or $14,933.00 per year, in addition to materials and assessment costs, for a total of $31,210.00 for the two-year program. P8; Tr. 516 (Espino); Tr. 617-618 (Ms. Parent). Ms. Espino expressed that the Student needs 2 years of instruction as well as a summer program, because some of the lessons take the Student 2-3 days to complete, rather than 1 day as intended. *Id.* The cost breakdown is outlined below:

| | |
|---|---|
| One-on-one dyslexia therapy services with a CALT, 4 hours per week, 47 weeks (188 hours)/$79.75 per hour, Year 1 | $14,993 |

Findings of Fact, Conclusions of Law, and Final Order
Cause No. 2024-SE-0160
Docket No. 11-2024-OSPI-02405
8612 - OSPI
Page 30

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA 98504-2489
(800) 845-8830
(206) 587-5135

| | |
|---|---|
| One-on-one dyslexia therapy services with a CALT, 4 hours per week, 47 weeks (188 hours)/$79.75 per hour, Year 2 | $14,993 |
| Norm-Referenced, Initial Assessment | $200 |
| Norm-Referenced Annual Assessment (Year 1) | $200 |
| Norm-Referenced Exit Assessment (End of Year 2) | $200 |
| Progress Reporting (Nov and April) - Year 1 | $100 |
| Progress Reporting (Nov and April) - Year 2 | $100 |
| Initial Materials | $154 |
| Remaining Total Materials Cost (Books 3-7) | $100 |
| IEP Representation (CALT and DOD Representative) Year 1 | $75 |
| IEP Representation (CALT and DOD Representative) Year 2 | $75 |
| $5 Processing Fee Per Invoice (24 invoices) | $120 |
| Total | **$31,310** |

P8.

100. Progress reports from Dyslexia on Demand reflect that between November 2024 and March 2025, the Student made progress in reading, spelling, and cursive handwriting, and increased her words correct per minute (WPM) reading fluency in 4th grade and 5th grade level books. P51; P52; Tr. 504-508 (Espino). By January 9, 2025, the Student improved her reading fluency from 115 WPM to 127 WPM on a 4th grade reading book. P52; Tr. 504-508 (Espino). By March 7, 2025, the Student was making steady progress in WPM, increasing her reading fluency to 125 WPM at 5th grade level, but was still not reading at grade level. P52; Tr. 507 (Espino). As of the date of hearing, the Student had completed 50 sessions of the "Take Flight" program, and the first 2 books with mastery checks. P51; P52; Tr. 505-506 (Espino). However, the Student's progress reports do not reflect any measurements of reading comprehension, writing paragraphs or writing essays. *Id.*

## January 2025 IEP Meeting

101. On November 19, 2024, the Parents' attorney e-mailed the District to ask questions about the Developmental ELA curriculum, whether it utilized evidence-based structured literacy, the training/qualifications of the teachers, the data used to

Findings of Fact, Conclusions of Law, and Final Order
Cause No. 2024-SE-0160
Docket No. 11-2024-OSPI-02405
8612 - OSPI
Page 31

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA 98504-2489
(800) 845-8830
(206) 587-5135

support the District's determination that the Student was not making progress in general education, and the data used to support the last progress report. P39 at 2-3.

102.    On or around November 20, 2024, the Parents additionally requested the District pay for tutoring through Dyslexia on Demand, and provided "supporting documents" for the request. P39 at 2-3. It is not clear whether these documents included the November 2024 Dyslexia on Demand assessment. *Id.*

103.    On December 16, 2024, having received no response from the District, the Parents' attorney requested an emergency IEP meeting. P39 at 2. On December 18, 2024, the Parents also e-mailed the District to request an emergency IEP meeting, explaining that the Student was still struggling with her mental health and well-being. D20 at 5; Tr. 446-447 (Ms. Parent). That same day, the District sent the Parents an invitation to attend an IEP meeting on January 13, 2025. D20 at 1-4; D21.

104.    On January 8, 2025, the District responded to the Parents by e-mail that the Developmental ELA room would use "Collections" by Houghton Mifflin, the general education curriculum, and adapt the content, methodology or delivery of instruction to address the Student's individual needs. P39 at 1-2. The District also responded that it would use "Vocabulary Surge" by 95 Percent Group. *Id.* The District further responded that SDI would be delivered in small-group or 1:1 by a special education teacher or paraeducator under the supervision of a special education teacher, and that both Ms. Gonzales and Ms. Schumacher had received dyslexia training. P39 at 1. The District also responded that the decision to move the Student to the Developmental ELA was based on classroom data and informal observations and assessments, and that delivering SDI in a smaller special education setting would be more effective and allow the Student to make sufficient progress on her ELA IEP goals. P39 at 1. Finally, the District reported that the progress report was based on data collected by Ms. Gonzales and/or Ms. Schumacher since the initial April 2024 IEP was developed. *Id.*

105.    On January 10, 2025, the Parents e-mailed the District asserting that neither "Collections" by Houghton Mifflin, nor "Vocabulary Surge" by 95 Percent Group, qualified as multisensory structured literacy based interventions effective for students with dyslexia. P40 at 1; Tr. 452-453 (Parent). The Parents further emphasized that Houghton Mifflin offered a curriculum for students with dyslexia called "Read 180", and that 95 Percent Group also offered "95 RAP"[15] as an

---

[15] The Parents and District alternatively refer to this curriculum as "95 RAP" by the 95 Percent Group, or "95% RAP". P40, P21. For convenience, this curriculum is referenced in this order as 95 RAP.

Findings of Fact, Conclusions of Law, and Final Order
Cause No. 2024-SE-0160
Docket No. 11-2024-OSPI-02405
8612 - OSPI
Page 32

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA 98504-2489
(800) 845-8830
(206) 587-5135

evidence-based dyslexia program. *Id.* The Parents requested details of the dyslexia training received by the learning specialists, and the actual data used to make the decision to move the Student to the Developmental ELA classroom. *Id.*

106. On January 13, 2025, just prior to the IEP meeting, the Parent sent the District a progress report from Ms. Espino, the Student's dyslexia tutor with Dyslexia on Demand:

> Over the past eight weeks, [Student] has made significant progress in several areas. She has improved her ability to correctly produce sounds for letters of the alphabet and is becoming more proficient at identifying whether vowels should be read as short or long. Additionally, she is making steady progress in recognizing and identifying sounds within words while spelling. Her reading fluency has also increased notably. with an improvement of 19 words correct per minute on fifth grade level passages she has not practiced beforehand. Alongside these academic gains. [Student] has shown remarkable growth in confidence. She now answers questions more assuredly and willingly attempts to decode and read unfamiliar words. These achievements reflect her hard work and the effectiveness of her instruction, setting a strong foundation for continued growth.

P41 at 1; Tr. 504-505 (Espino); Tr. 104-105 (Gonzales).

107. The IEP team met on January 13, 2025. D21 at 1. Attendees included Mr. Anderson; the Parents and their attorney (via Zoom); Ms. Espino (via Zoom); Karen Finigan,[16] Executive Director of Special Services; Ms. Gonzales;  Ms. Greer; Mari Lysne, the school counselor and the Student's 504 coordinator; Ms. Pitzer; Ms. Schumacher; and the District's attorney. D21 at 5; Tr. 59-60, 62 (Gonzales); Tr. 306-307 (Greer); Tr. 124-125 (Schumacher); Tr. 264-265, 451 (Ms. Parent); Tr. 555-556 (Espino); Tr. 163 (Finigan).

---

[16] Ms. Finigan has a Bachelor of Arts in Elementary Education with an emphasis in Special Education (K-8) and early childhood education (Preschool to 3), and a Master's degree in Emotional Behavior Disturbance. Tr. 161 (Finigan). Ms. Finigan has worked as the District's Executive Director of Special Services for the past 9 years. *Id.* In August 2024, Ms. Finigan completed dyslexia and structured literacy training through the Learning Institute, which focused on the science of reading. Tr. 162-163 (Finigan). Ms. Finigan also completed training on "95 RAP", the structured literacy curriculum for students with reading difficulties and dyslexia provided through the District's curriculum instruction department. Tr. 163, 175 (Finigan).

108.    At the IEP meeting, attendees recalled that Ms. Espino talked first about the Dyslexia on Demand curriculum she was providing to the Student, her approach to teaching, and the Student's progress.  Tr. 167-168 (Finigan). The attendees discussed the curriculum used in the Developmental ELA class, the Parent's requests for a specific curriculum and questions about the teacher's qualifications, and how the Developmental ELA class was taught. D20 at 7; Tr. 60 (Gonzales);  Tr. 165-167 (Finigan).

109.    The IEP team ultimately did not change any of the SDI outlined in the October 2024 Amended IEP. D21 at 2-4. An undated PWN specified that the District rejected the Parents' request to change the Student's placement to General Education ELA for her health stating:

> [C]urrent data (current evaluation, MAP assessment scores-Well Below grade level, SBA assessment scores-Well Below grade level, current IEP goal progress, and work samples) and needs expressed by parents for intervention instruction to assist in dyslexia shows the most appropriate placement for [Student] is in the special education setting for specially designed instruction in ELA.

D21 at 3; Tr. 165-166 (Finigan); Tr. 458 (Ms. Parent).

110.    The PWN further indicated that the District rejected the Parent's request to provide a specific dyslexia curriculum such as "95 RAP," noting that the District believed the curriculum being used, "Collections," "Vocabulary Surge" and "Multisyllabic Routine Cards", were sufficiently adapted by the learning specialist to include multisensory learning.  D21 at 3. The District also rejected the Parent's request to pay for the Student's Dyslexia on Demand tutoring , because the team believed that the curriculum currently provided to the Student was sufficient. *Id.*

111.    The PWN outlined the education and qualifications of Ms. Gonzales and Ms. Schumacher, including their dyslexia training from GLEAN, training on the Science of Reading, and training on curriculum from the 95 Percent Group. D21 at 3. The PWN further specified that the data used to determine the Student's placement in Developmental ELA included MAP assessment scores, SBA assessment scores, current IEP goal progress and work samples, as well as the needs expressed by the Parents for intervention instruction to assist with dyslexia. *Id.*

112.    After attending the January 13, 2025, IEP meeting, the Parents did not change their minds about having the Student attend the Developmental ELA class. Tr. 265 (Ms. Parent). The Parents believed that the District was not addressing the Student's

mental health struggles, and that the curriculum used by the District was not dyslexia-specific and was thus insufficient to meet the Student's needs. *Id.*

113.    The Student has not returned to any ELA class at Lakeridge, and has received no ELA instruction at Lakeridge since October 29, 2024. *Id.* Rather, she continues to be brought home by her Parents during 4th period, and receive private dyslexia tutoring. Tr. 262, 264, 447-448 (Ms. Parent).

<u>District ELA Curriculum and Intervention ELA Class</u>

114.    The District provides students with multi-tier systems of support (MTSS). Tr. 308-309 (Geer); Tr. 132 (Schumacher); Tr. 72-74 (Gonzales). Tier I of MTSS consists of general education students who receive the general education curriculum in the general education classroom, Tier II consists of students who require small group or extra support and may be enrolled in an intervention class. *Id. See also*, P25 at 22-23. Tier III is the highest level of support consisting of students who require developmental skills and are placed in a developmental class. All students, whether general education or special education, can receive supports under any Tier. Tr. 180-181 (Finigan). Special education students also receive SDI beyond MTSS. *Id.*

115.    The Washington State Office of Superintendent of Public Instruction (OSPI) has published Dyslexia Guidance: Implementing MTSS for Literacy. P25. This publication was created to support schools in implementing ESSB 6162.[17] P25 at 1. The Dyslexia Guidance emphasizes that school districts are required to screen students in grades K-2 for risk factors associated with dyslexia, and required to provide students in grades K-2 who are at risk for reading difficulties, such as dyslexia, with evidence-based multisensory structured literacy interventions. *Id.* at 5-6, 8, 11. While the Dyslexia Guidance further specified that students across all grades benefit from structured literacy interventions, it does not outline a specific intervention or curriculum for any student identified with risk factors associated with dyslexia. P25 at 18, 25.

116.    During both the 2023-2024 and 2024-2025 school year, the District used the ELA curricula "Collections" by Houghton Mifflin. Tr. 309 (Greer); Tr. 320 (Campbell); Tr. 56-57 (Gonzales). "Collections" is geared toward 6th-8th grade students to teach reading, writing, and spelling at grade-level standards. Tr. 309-310 (Greer); Tr. 320-

---

[17] Engrossed Second Substitute Senate Bill (ESSB) 6162 created RCW 28A.320.250, .260, and .270. It was enacted during the 65th Legislature 2018 Regular Session and signed into law on March 16, 2018.

321 (Campbell). This curriculum is used in the General Education ELA, which focuses on reading, writing, speaking and listening. Tr. 295-296 (Greer).  However, all ELA teachers use this curriculum. Tr. 310 (Greer).

117.    In Developmental ELA, in addition to the "Collections" curriculum, the District uses the supplemental curriculum "Vocabulary Surge" by 95 Percent Group to teach morphology of words and parts of words, and "Multisyllabic Routine Cards" to teach word syllables. Tr. 119-120 (Schumacher); Tr. 57-58, 92-95 (Gonzales). This curriculum is not specifically developed for dyslexic students, but includes dyslexia-focused sections. Tr. 174-175 (Finigan); Tr. 129 (Schumacher). The Developmental ELA class also includes hands-on learning, multisensory teaching, decoding skills and manipulatives and uses District approved tools to track reading fluency and comprehension such as "ReadWorks". Tr. 57, 94, 107 (Gonzales); Tr. 141-142 (Schumacher).

118.    During the 2024-2025 school year, the District also offered an Intervention ELA classes, which students could take as an elective in addition to General Education ELA. Tr. 92 (Gonzales). Intervention classes are for students who need additional support in ELA or math. Tr. 107 (Gonzales). When placing a student in an intervention class, the District considers MAP scores and SBA scores, grades, and whether it is parent-requested or teacher-requested. Tr. 107-108 (Gonzales). Intervention classes can be general education or special education classes. Tr. 108 (Gonzales). There is no evidence of any specific SDI offered or taught in the Intervention ELA class.

119.    The Intervention ELA class uses the District approved intervention reading curriculum "Read 180," by Houghton Mifflin, a dyslexia-based curriculum. Tr. 177-176 (Finigan); Tr. 291 (Greer); Tr. 138-139 (Schumacher). "Read 180" identifies the gaps in a student's ELA instruction, is connected to MAP scores and sets out an individual learning program for each student working on both coding and phonetic reading skills, as well as comprehension skills. Tr. 138-139 (Schumacher); Tr. 91-92 (Gonzales).

120.    Ms. Greer teaches both General Education ELA and an Intervention ELA class. Tr. 291-292, 296 (Greer). While General Education ELA contains 26-30 students, Intervention ELA  has only 14 students, is co-taught with a special education teacher and uses the dyslexic-specific "Read 180" curriculum. Tr. 291-292, 296 (Greer). Each student receives lots of reading practice and small group test preparation for grade level testing. *Id*. Ms. Greer did not see the Parent's January 10, 2025 e-mail that identified "Read 180" as a dyslexia curriculum, and did not recall whether "Read 180" was discussed during the January 2025 IEP meeting. P40 at 1; Tr. 311-312 (Greer).

Ms. Greer also did not personally discuss "Read 180" or offer it to the Parents at any time prior to the IEP meeting. Tr. 312 (Greer). Ms. Greer believes that the "Read 180" curriculum could be helpful in either Tier II (intervention classes) or Tier III (developmental classes). Tr. 310-311 (Greer).

121.    Ms. Schumacher, who provided the Student's SDI in the Developmental ELA class, also co-teaches two Intervention ELA classes which contain a mix of general education and special education students and use the "Read 180" curriculum. Tr. 117-118, Tr. 122-123, 137-139 (Schumacher). Ms. Schumacher recalled that during the January 2025 IEP meeting, she informed the parents that the 95 Percent curriculum used in the Developmental ELA had a dyslexia portion and they could use this with the Student, but that the Parents specifically requested the dyslexia-based curriculum "95 RAP". Tr. 126-127 (Ms. Schumacher). Ms. Schumacher agreed the District has access to both "Read 180" and "95 RAP", and that the District specifically rejected the Parents' request the District use "95 RAP" in the Developmental ELA room, but could not recall the reason the District denied the request. D21; Tr. 129, 138 (Schumacher).

122.    Ms. Finigan, the District's Executive Director of Special Services, also did not know why "Read 180" was not offered to the Student, but speculated that the resource room might already be using a different structured literacy program to support the Student. Tr. 177-178 (Finigan). Ms. Finigan further recalled that the IEP team discussed the "95 RAP" curriculum at the January 2025 IEP meeting, and confirmed that the dyslexia-focused curriculum was utilized by the District. Tr. 166-167 (Finigan). However, Ms. Finigan did not know whether "95 RAP" was offered in Developmental ELA room, or why the January 2025 PWN specifically rejected offering this curriculum to the Student. D21; Tr. 175-177 (Finigan). Ms. Finigan expressed that she has no issues with the District providing the Student with "95 RAP" curriculum. Tr. 177 (Finigan).

123.    The Parents were unaware that the District provided any dyslexia-specific intervention curriculum until the first date of hearing. Tr. 269, 615, 617 (Ms. Parent). The Parents do not recall that the Student was ever offered either "Read 180" or "95 RAP" as a reading intervention. *Id.* None of the prior IEPs mention the existence of an Intervention ELA class or a District dyslexia-specific curriculum. *Compare,* D9 (April 2024 IEP), D12 (May 2024 Amended IEP), D15 (October 2024 Amended IEP).

Findings of Fact, Conclusions of Law, and Final Order
Cause No.  2024-SE-0160
Docket No. 11-2024-OSPI-02405
8612 - OSPI
Page 37

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA  98504-2489
(800) 845-8830
(206) 587-5135

Parent's Expert Witnesses

124.    At hearing, the Parents presented Brandi Blaylock,[18] M.Ed., CALT, LDT, as their dyslexia expert witness. P2; Tr. 332-333 (Blaylock). Ms. Blaylock explained that dyslexia presents as a phonological processing deficit, and that the brain of a dyslexic student cannot recognize and hold sounds and symbols. Tr. 342-343 (Blaylock). Dyslexia is usually diagnosed with a test battery including the WISC-V, which measures cognitive abilities and the KTEA-3, which measures reading abilities, and the WJ-IV, which measures phonological awareness. Tr. 348-349 (Blaylock). Most dyslexic individuals have average to above average IQ. Tr. 348 (Blaylock). Dyslexia cannot be treated, but can be remediated with teaching of basic reading skills. *Id.*

125.    Ms. Blaylock expressed that appropriate remediation and interventions to dyslexia are student specific, but effective remediations contain the commonalities of structured literacy, multisensory instruction, step-by-step process, explicit teaching, scaffolding skills, and progress monitoring. Tr. 350-351 (Blaylock). Structured literacy focuses on how literacy skills are taught, including the basic language skills of phonemic awareness, decoding words and units of words, leading to reading paragraphs and then reading fluency. P16; Tr. 351-353 (Blaylock).

126.    Ms. Blaylock acknowledged that many different structured literacy programs exist, and that no specific program is necessary to remediate dyslexia. Tr. 358 (Blaylock). However, Ms. Blaylock emphasized that all structured literacy programs focus on the letter level and sounds of reading, not simply on whole words, and starts with phonological processing of letter sounds. Tr. 358-362 (Blaylock).  Ms. Blaylock emphasized that each dyslexia-based program must follow the proper scope and sequence, going into the depth of phonological processing, and be implemented with fidelity, or taught to the standards of the program. Tr. 363-365 (Blaylock). Ms. Blaylock further emphasized that dyslexia affects the social/emotional wellbeing of students, and that students may develop anxiety or mental health issues without early diagnosis and intervention. P19; Tr. 365-366 (Blaylock).

---

[18] Ms. Blaylock has a Bachelor of Science in Biology and Music, a Master's of Science in Neuropharmacology, and a Master's degree in Educational Leadership. P2; Tr. 332-333 (Blaylock). She is a certified CALT, which required a 2-year certification and 700 practical hours prior as completing a certification exam. P9; Tr. 334-335 (Blaylock). She is licensed in Texas as a Dyslexia Therapist, has a Texas teaching certificate in early childhood education to 8th grade, and is certified as an Orton-Gillingham instructor. P2; Tr. 336-339 (Blaylock). Ms. Blalock has worked for Dyslexia on Demand since 2020, and previously taught dyslexic students in both public school and private schools. *Id.* She is also a member of the International Dyslexia Association (IDA). Tr. 340 (Blaylock).

Findings of Fact, Conclusions of Law, and Final Order
Cause No. 2024-SE-0160
Docket No. 11-2024-OSPI-02405
8612 - OSPI
Page 38

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA 98504-2489
(800) 845-8830
(206) 587-5135

127.    Ms. Blaylock reviewed the Student's Dyslexia on Demand assessments, and Dr. Bode's reports. P5; P6; D34; D34a; Tr. 370-372, 374 (Blaylock). Ms. Blaylock also observed 3 one-hour sessions between the Student and Ms. Espino. Tr. 371, 373 (Blaylock). Ms. Blaylock observed that the Student is a very hard worker and wants to learn, but is very behind in reading skills for her age. Tr. 373-375 (Blaylock). Ms. Blaylock opined that based on the Student's diagnoses and current progress, she requires a consistent and repetitive daily program to support her readings skills, preferably in a private environment, as she might be reluctant to practice her skills in a mainstream classroom. *Id.* However, Ms. Blaylock did not testify that the Student required a specific curriculum. Tr. 358, 373-375 (Blaylock).

128.    Ms. Blaylock reviewed the Student's April 2024 IEP and service matrix for SDI. D9 at 14; Tr. 376-377 (Blaylock). In her opinion, 10 minutes per week of concurrent SDI in basic reading and reading comprehension was insufficient, as it would not allow enough intensity for repetitions and scope and sequence for each goal. *Id.*

129.    Ms. Blaylock also reviewed the Student's October 2024 Amended IEP and service matrix for SDI. D15 at 4; Tr. 377-379 (Blaylock). While she acknowledged this increased the SDI of basic reading to 30 minutes per day/5 times per week, concurrent with reading comprehension, she opined that it was still not enough because the Student's reading skills were still very low. *Id.* Ms. Blaylock further opined that no structured literacy program could be implemented with fidelity at only 30 minutes per day/5 times per week. *Id.* Ms. Blaylock emphasized that the Student's MAP scores reflected consistently declining scores in ELA, indicating that the gap between her and her peers was increasing. P47; Tr. 381 (Blaylock).

130.    Ms. Blaylock holds a Master's in Educational Leadership, a Texas teaching certificate in early childhood education to 8th grade, is licensed in Texas as a Dyslexia Therapist, is a certified CALT and certified Orton-Gillingham instructor, has worked for Dyslexia on Demand since 2020, and has taught dyslexic students both in the public and private school setting. P2; P9; Tr. 334-340 (Blaylock). Therefore, Ms. Blaylock has the experience and training necessary to understand the Orton-Gillingham method, review the methodology and curriculum used by Dyslexia on Demand as well as its effectiveness with dyslexic students, and how many minutes per week might be required to teach a dyslexic student how to read with this curriculum.

131.    However, Ms. Blaylock never spoke directly with the District about the April 2024 IEP or the October 2024 IEP. Tr. 391, 394-395 (Blaylock). Ms. Blaylock has not observed the Student at school, has never spoken to anyone at the District about the how SDI would be delivered, and has never spoken with any of the Student's teachers. Tr. 385-386, 402 (Blaylock). Ms. Blaylock is not familiar with the different types of

literacy or ELA instruction offered at Lakeridge, and is only familiar with 95 Percent group. Tr. 394-397 (Blaylock). Ms. Blaylock is not familiar with the qualifications or training of the Student's teachers or learning specialists at Lakeridge. *Id.* Ms. Blaylock also acknowledged that the Student's MAP scores primarily focus on reading comprehension, rather than phonological deficits. P47; Tr. 401 (Blaylock).

132.    Based on these facts, I conclude that Ms. Blaylock's opinion has value regarding the appropriateness of the amount of SDI minutes outlined in the Student's April 2024 IEP and May 2024 Amended IEP for Basic Reading. However, I accord limited weight to her opinions about the appropriateness of the SDI outlined in the October 2024 Amended IEP, the ELA instruction offered at Lakeridge, or the qualifications of the educators at Lakeridge.

133.    Ms. Espino, the Student's Dyslexia on Demand tutor, also testified at hearing regarding the appropriateness of SDI offered to the Student by the District. D21; Tr. 494-524 (Espino). Ms. Espino recalled being present at the January 13, 2025 IEP meeting. D21; Tr. 511 (Espino). Ms. Espino did not believe the District showed enough information to support its decision to move the Student to Developmental ELA, or that it was the least restrictive environment for the Student. D21 at 3; Tr. 513-515 (Espino). Ms. Espino believed that moving the Student from general education ELA removed her completely from the 8th grade ELA content, and emphasized that the Student stopped attending due to her anxiety. *Id.* Ms. Espino believed that any SDI provided to the Student would be inappropriate unless it included instruction in basic reading and decoding skills. Tr. 514-515, 524 (Espino). Ms. Espino recalled that the teachers in Developmental ELA explained they would work with the Student on the morphology of the English language, but did not recall any other details of how the Student would be taught. Tr. 540-541 (Espino).

134.    Ms. Espino further asserted that all dyslexic students require curriculum based on the Orton-Gillingham method, and that teaching should be one-on-one or in a small group no more than 4 students, so that progress can be monitored. Tr. 524 (Espino). Ms. Espino acknowledged that "Take Flight" is not the only effective dyslexia-focused curriculum program, and that many such programs exist. Tr. 494-495 (Espino). However, she emphasized that any dyslexia-focused curriculum must be taught with fidelity, meaning it must be taught how the author/researcher intended the program to be taught or it will not yield the expected result. P15; P16; P19; Tr. 494-496 (Espino). This includes following the author's recommended dosage, or the amount of time a student must be taught each week. *Id.* For the "Take Flight" program, the authors recommend either 45 minutes per day 5 days per week, or 60 minutes per day, 4 days per week. *Id.*

Findings of Fact, Conclusions of Law, and Final Order
Cause No.  2024-SE-0160
Docket No. 11-2024-OSPI-02405
8612 - OSPI
Page 40

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA  98504-2489
(800) 845-8830
(206) 587-5135

135.    Ms. Espino holds a Master's in Educational Leadership, a Master's in Education with an emphasis in dyslexia, and holds a teaching certificate from Texas. Ms. Espino is both a certified CALT in Texas, and a Qualified Instructor (QI) of the Take Flight dyslexia curriculum, and teaches both general education and special education teachers to teach the curriculum. Therefore, Ms. Espino has the experience and training necessary to understand the  Orton-Gillingham  method, review the methodology and curriculum used by Dyslexia on Demand as well as its effectiveness with dyslexic students, and how many minutes per week might be required to teach a dyslexic student how to read with this curriculum.

136.    However, Ms. Espino did not recall any details of how the Student would be taught in Developmental ELA, or what curriculum would be used, other than that the Student would be taught morphology of language. Ms. Espino mistakenly believed that removing the Student from the general education ELA also remove her completely from the 8th grade ELA content, however the record reflects that all ELA classes use the grade level curriculum "Collections." Further, while Ms. Espino asserted that all dyslexic students require curriculum based on Orton-Gillingham, she did not point to the basis for this opinion other than her experience in teaching this method. The Student's November 2024 Dyslexia Assessment from Dyslexia on Demand also did not specify that an Orton-Gillingham approach was required for the Student to learn to read. Rather, the evaluation specified that an Orton-Gillingham reading instruction program would "help remediate" the Student's reading and comprehension weaknesses. Ms. Espino additionally testified that even with tutoring, the Student might never close the gap with her peers because she did not read properly by the 4th grade. This recognizes that even the Orton-Gillingham method does not perfectly teach a dyslexic student how to read at grade level.

137.    Based on these facts, I conclude that Ms. Espino's opinion has value regarding the Student's progress on the curriculum offered by Dyslexia on Demand. However, I accord limited weight to her opinions about the curriculum offered by the District in the Developmental ELA class, as she had no knowledge about what this curriculum would entail. I also accord little weight to her opinion that all dyslexic students require a curriculum based on the Orton-Gillingham method, as the conclusion was made without any additional explanation, the Student's November 2024 evaluation did not specify that the Student required Orton-Gillingham to learn to read, and Ms. Espino acknowledged that even with this method the Student might never close her reading gap with peers.

138.    Ms. DeAeth, the individual who conducted the Student's November 2024 Dyslexia Assessment, also testified at hearing. Ms. DeAeath opined that the Student had moderate to severe dyslexia, which could be remediated to mild if gaps in learning

were filled in. Tr. 667-668 (DeAeth). Ms. DeAeth specifically recommended "Take Flight" as an appropriate Orton-Gillingham influenced curriculum for the Student, but agreed that many other dyslexia curricula influenced by the Orton-Gillingham method would be appropriate if they were explicit, multisensory, structured, and sequential in their implementation. Tr. 669-670 (DeAeth). However, Ms. DeAeth did not testify that the Student required this type of curriculum to make progress in reading. *Id.*

139.    Ms. DeAeth further opined that 60 minutes, 4-5 days per week, of appropriate dyslexia literacy instruction was necessary for a dyslexic student similar to the Student, although 45 minutes 5 times per week could be sufficient. Tr. 671 (DeAeth). Ms. DeAeth reviewed the Student's April 2024 IEP, and concluded that 10 minutes of SDI per week was insufficient to remediate her reading deficits. D9 at 14; Tr. 671-672 (DeAeth). Ms. DeAeth also reviewed the Student's October 2024 Amended IEP, and opined that 30 minutes of SDI 5 times/week of reading comprehension might be sufficient, but that 5 minutes of SDI 5 times/week in basic reading skills was insufficient, and that she would also recommend SDI in spelling to remediate the Student's deficits in spelling. D15 at 14; Tr. 695-696 (DeAeth). She offered no opinion on the sufficiency of the SDI for Written Instruction or Math Calculation. *Id*.

140.    Ms. DeAeth is a dyslexia diagnostician and dyslexia tutor, with previous experience as a dyslexia specialist with 23 years in the field. She holds a Master's degree in Special Education with a diagnostician certificate, is a nationally certified CALT, and has previously worked in public schools in Texas as a diagnostician, dyslexia tutor and reading specialist. Therefore, Ms. DeAeth has the experience and training necessary to assess a Student's reading deficiencies, and to determine how many minutes per week might be required to teach a dyslexic student how to read with appropriate remediation.

141.    Based on these facts, I conclude that Ms. DeAeth's opinion has value regarding the Student's diagnosis, the gaps in her reading abilities, and the appropriateness of the amount of SDI in her April 2024 and May 2024 IEPs to remediate her deficits. However, while Ms. DeAeth recommended that the Student receive an Orton-Gillingham curriculum, she provided no testimony regarding the curriculum that would be used by the District, the training of District teachers. She also asserted that the Student's moderate to severe dyslexia could be remediated to mild if gaps in learning were filled in. Therefore, I accord little weight to her opinion that the Student should receive instruction in the Orton-Gillingham method, or a curriculum influenced by this method.

142.    Finally, Ms. Gittens, the Student's therapist, also testified at hearing. Ms. Gittens opined that if the Student returned to the Developmental ELA class, she would regress to her prior anxiety symptoms. Tr. 643 (Gittens). Ms. Gittens has encouraged the Student to try out the Developmental ELA class, but has not been successful. *Id.* Ms. Gittens emphasized that the Student currently expressed no anxiety about her private tutoring through Dyslexia on Demand, and that she liked the sessions. *Id.*   Ms. Gittens also acknowledged at hearing that a client's anxiety could be remediated by exposure to the stressful situation, although that it would require adequate preparation and coping skills. Tr. 647-649 (Gittens).

143.    Ms. Gittens is a Licensed Mental Health Counselor through the State of Washington, and has worked with the Student for several years. Therefore, she is qualified to offer an opinion on the Student's mental state. Nevertheless, because the Student only attended Developmental ELA for three days, and because Ms. Gittens admits that the Student's anxiety could be remediated with preparation and coping skills, I accord little weight to Ms. Gittens' opinion that the Student's mental health symptoms prevent her from attending Developmental ELA.

<u>CONCLUSIONS OF LAW</u>

### Jurisdiction and Burden of Proof

1.    The Office of Administrative Hearings (OAH) has jurisdiction over the parties and subject matter of this action for the Superintendent of Public Instruction as authorized by 20 United States Code (USC) §1400 *et seq.*, the Individuals with Disabilities Education Act (IDEA), Chapter 28A.155 Revised Code of Washington (RCW), Chapter 34.05 RCW, Chapter 34.12 RCW, and the regulations promulgated under these provisions, including 34 Code of Federal Regulations (CFR) Part 300, and Chapter 392-172A Washington Administrative Code (WAC).

2.    The District bears the burden of proof in this matter. RCW 28A.155.260(1). In a due process hearing, the burden of proof is a preponderance of the evidence. RCW 28A.155.260(3).

### The IDEA and FAPE

3.    Under the IDEA, a school district must provide a free and appropriate public education (FAPE) to all eligible children. In doing so, a school district is not required to provide a "potential-maximizing" education, but rather a "basic floor of opportunity." *Bd. of Educ. of Hendrick Hudson Central Sch. Dist. v. Rowley*, 458 U.S. 176, 197 n.21, 200-201 (1982).

4.     In *Rowley*, the United States Supreme Court established both a procedural and a substantive test to evaluate a state's compliance with the IDEA, as follows:

> First, has the state complied with the procedures set forth in the Act? And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits? If these requirements are met, the State has complied with the obligations imposed by Congress and the courts can require no more.

*Rowley*, 458 U.S. at 206-07 (footnotes omitted).

5.     The first inquiry is whether the District has complied with the procedures established by the IDEA. *Id.* at 206-07. Procedural safeguards are essential under the IDEA, particularly those that protect the parents' right to be involved in the development of their child's educational plan. *Amanda J. v. Clark County Sch. Dist.*, 267 F.3d 877, 882 (9th Cir. 2001). Procedural violations of the IDEA amount to a denial of FAPE and warrant a remedy only if they:

> (I) impeded the child's right to a free appropriate public education;

> (II) significantly impeded the parents' opportunity to participate in the decision-making process regarding the provision of a free appropriate public education to the parents' child; or

> (III) caused a deprivation of educational benefits.

 20 USC §1415(f)(3)(E)(ii); see WAC 392-172A-05105(2); 34 CFR §300.513(a)(2).

6.     The next question is whether the District has violated the substantive requirements of the IDEA. The Supreme Court recently clarified the substantive portion of the *Rowley* test as quoted above. "To meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F. v. Douglas County Sch. Dist. RE-1*, 137 S. Ct. 988, 999, 197 L.Ed.2d 335 (2017). Additionally, the Student's "educational program must be appropriately ambitious in light of his circumstances . . . ." *Id.* at 1000.

7.     The Ninth Circuit has explained the *Endrew F.* standard as follows:

In other words, the school must implement an IEP that is reasonably calculated to remediate and, if appropriate, accommodate the child's disabilities so that the child can make progress in the general education curriculum . . . taking into account the progress of his non-disabled peers, and the child's potential.

*M.C. v. Antelope Valley Union High Sch. Dist.,* 858 F.3d 1189, 1201 (9th Cir.), *cert. denied*, 138 S. Ct. 556 (2017) (citations omitted; internal quotation marks omitted).

8.    The determination of reasonableness is made as of the time the IEP was developed. *Adams v. State of Oregon*, 195 F.3d 1141, 1149 (9th Cir. 1999). An IEP is "a snapshot, not a retrospective." *Id.*

## ISSUES AND REMEDIES

**Whether the District violated the IDEA and denied the Student a FAPE by failing to evaluate the Student for an Individualized Education Program (IEP) after the Parent requested the District to evaluate the Student the Summer of 2023 based on an outside private evaluation (Issue #1)**

9.    The Parents argue that the District failed to initiate a special education evaluation prior to the Student's enrollment at Lakeridge, despite knowledge of the Student's complex disability profile and receipt of Dr. Bode's private evaluation. PB42-43. The Parents assert that the District's failure to timely evaluate the Student denied the Student FAPE for months. *Id.*

10.    The District does not dispute that it received the Parent's request to initiate a special education evaluation, and Dr. Bode's private evaluation, shortly before the 2023-2024 school year began. DB24, 26. However, the District argues that it could not determine the Student's need for special education or related services because there was no evidence of what type of education or interventions she had previously received, and that she could not be determined eligible for special education services if her deficits were due to a lack of appropriate instruction in grade level standards in reading or math instruction. *Id.*

11.    The IDEA requires school districts to "conduct child find activities calculated to reach all students with a suspected disability for the purpose of locating, evaluating and identifying students who are in need of special education and related services, regardless of the severity of their disability." WAC 392-172A-02040(1).

Findings of Fact, Conclusions of Law, and Final Order
Cause No.  2024-SE-0160
Docket No. 11-2024-OSPI-02405
8612 - OSPI
Page 45

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA  98504-2489
(800) 845-8830
(206) 587-5135

12.    The IDEA further mandates that school districts have policies and procedures in effect that describe the methods used to conduct Child Find activities.  Methods used may include, but are not limited to, activities such as:

 Using internal district child find methods such as screening, reviewing district-wide test results, providing in-service education to staff, and other methods developed by the school districts to identify, locate and evaluate students including a systematic, intervention based, process within general education for determining the need for a special education referral.

WAC 392-172A-02040(3)(f).

13.    A recent decision from the U.S. District  Court, *E.S. v. Conejo Valley Unified Sch. Dist.*, 2018 U.S. Dist. LEXIS 126251 (C.D. Cal. July 27, 2018), sets out the current state of the law regarding a school district's child-find duty in the Ninth Circuit:

> "Child-find requires school districts to develop a method to identify, locate, and evaluate students with disabilities who are in need of special education services." *Beauchamp v. Anaheim Union High Sch. Dist*., 816 F.3d 1216, 1221 (9th Cir. 2016). "[C]laims based on a local educational agency's failure to meet the 'child find' requirement are cognizable under the IDEA." *Compton Unified Sch. Dist. v. Addison*, 598 F.3d 1181, 1185 (9th Cir. 2010). The Ninth Circuit instructs that a duty to evaluate arises when a disability is deemed "suspected":
>
> > [A] disability is suspected, and therefore must be assessed by a school district, when the district has notice that the child has displayed symptoms of that disability. In *Pasatiempo by Pasatiempo v. Aizawa*, 103 F.3d 796 (9th Cir. 1996), for example, we held that the informed suspicions of parents, who may have consulted outside experts, trigger the requirement to assess, even if the school district disagrees with the parent's suspicions because [t]he identification [and assessment] of children who have disabilities should be a cooperative and consultative process. *Id*. at 802. Once either the school district or the parents suspect disability, we held, a test must be performed so that parents can receive notification of, and have the opportunity to contest, conclusions regarding their children. *Id.*

Findings of Fact, Conclusions of Law, and Final Order
Cause No.  2024-SE-0160
Docket No. 11-2024-OSPI-02405
8612 - OSPI
Page 46

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA  98504-2489
(800) 845-8830
(206) 587-5135

> *Timothy O. v. Paso Robles Unified Sch. Dist.*, 822 F.3d 1105, 1119-20
> (9th Cir. 2016), cert. denied, 137 S. Ct. 1578, 197 L. Ed. 2d 704 (2017);
> see also *J.K. v. Missoula Cnty. Pub. Sch.*, 713 F. App'x 666, 667 (9th Cir.
> 2018) (The duty to evaluate a student arises when disability is
> suspected, or when the district has notice that the child has displayed
> symptoms of that disability.) (quoting *Timothy O.*, 822 F.3d at 1119);
> *S.B. v. San Mateo Foster City Sch. Dist.*, 2017 U.S. Dist. LEXIS 217440,
> 2017 WL 4856868, at *13 (N.D. Cal. April 11, 2017) (A school district's
> child find duty is triggered when it has reason to suspect a child has a
> disability, and reason to suspect the child may need special education
> services to address that disability.) (citing *Dep't of Educ. v. Cari Rae S.*,
> 158 F. Supp. 2d 1190, 1194 (P. Haw. 2001)). Whether a school district
> had reason to suspect that a child might have a disability must be
> evaluated in light of the information the district knew, or had reason to
> know, at the relevant time, not exclusively in hindsight. *Adams v. State
> of Oregon*, 195 F.3d 1141, 1149 (9th Cir. 1999) (quoting *Fuhrmann v.
> East Hanover Bd. of Educ.*, 993 F.2d 1031, 1041 (3d Cir. 1993)).
> However, some consideration of subsequent events may be permissible
> if the additional data provide[s] significant insight into the child's
> condition, and the reasonableness of the school district's action, at the
> earlier date. E.*M. v. Pajaro Valley Unified Sch. Dist.*, 652 F.3d 999, 1006
> (9th Cir. 2011) (quoting *Adams*, 195 F.3d at 1149).

*E.S. v. Conejo Valley Unified Sch. Dist.*, 2018 U.S. Dist. LEXIS 126251 (C.D. Cal. 2018)
(internal quotation marks omitted.).

14.    However, the law is not clear when exactly a district's child find obligation is
triggered. In 2014, the Ninth Circuit Court of Appeals recognized:

> We have not yet articulated a test for when the child find obligation is
> triggered. The parties and the district court rely upon a test articulated
> by a Hawaii district court. See *Dept. of Educ., Haw. v. Cari Rae S.*, 158
> F. Supp. 2d 1190 (D. Haw. 2001) ("[T]he child-find duty is triggered when
> the [district] has reason to suspect a disability, and reason to suspect
> that special education services may be needed to address that
> disability.") (internal quotation marks omitted). The Sixth and Third
> Circuits have promulgated tests that differ significantly from the *Cari
> Rae* standard. See *D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 249 (3d
> Cir. 2012) (noting that "Child Find does not demand that schools
> conduct a formal evaluation of every struggling student"); *Bd. of Educ.
> of Fayette Cnty., Ky. v. L.M.*, 478 F.3d 307, 314 (6th Cir. 2007) (holding

that the individual claiming a child find violation must demonstrate "that school officials overlooked clear signs of disability and were negligent in failing to order testing or that there was no rational justification for not deciding to evaluate").

*G.M. v. Saddleback Valley Unified Sch. Dist.*, 583 F. App'x 702, 703-04 n.1 (9th Cir. 2014); see also *P.B. v. Thorp Sch. Dist*., 2021 U.S. Dist. LEXIS 59845 (E.D. Wash. 2021) (noting some District Courts have relied on standard articulated in *Cari Rae).*

15.     In 2016, the Ninth Circuit issued its decision in *Timothy O.*, which stands for the proposition that a disability is suspected, and therefore must be assessed by a school district, when the district has notice that the child has displayed symptoms of that disability. *Timothy O.,* 822 F.3d at 1119-20. In that case, a staff member informally observed the student and advised that no additional testing was necessary. The court held that "if a school district is on notice that a child may have a particular disorder, it *must* assess that child for that disorder, regardless of the subjective views of its staff members concerning the likely outcome of an assessment." *Id*. at 1121.

16.     Whether a district must also have a reason to suspect the child may need special education services to address that disability was not at issue in *Timothy O*., and this precise issue has not been decided. Subsequently, district courts within the Ninth Circuit have used varied language in setting out the applicable standard. *Compare S.B. v. San Mateo Foster City Sch. Dist.*, 2017 U.S. Dist. LEXIS 217440 *40 (N.D. Cal. Apr. 11, 2017) (child find duty triggered when District has reason to suspect a child has a disability and reason to suspect a child may need special education to address that disability); *A.P. v. Pasadena Unified Sch. Dist.*, 2021 U.S. Dist. LEXIS 42440 *17-18, 22 (C.D. Cal. Jan. 26, 2021) (child find duty triggered when there is knowledge of, or reason to suspect a disability); *N.N. v. Mt. View-Los Altos Union High Sch. Dist.*, 2022 U.S. Dist. LEXIS 139275, 2022 WL 3109588 *81 (N.D. Cal. Aug. 4, 2022) (child find obligation is triggered when the school district "has reason to suspect a disability, and reason to suspect that special education services may be needed to address that disability").

17.     None of these cases addressed the discrepancy between how the standard is worded. However, the IDEA defines "a child with a disability" as a child evaluated with one of 12 disability eligibility categories "and who, by reason thereof, needs special education and related services." 34 CFR § 300.8(a) . Washington law closely aligns with this definition, and similarly specifies a student is eligible for special education if the student has a disability in one of the eligibility categories "and who, because of the disability and an adverse educational impact, has unique needs that cannot be addressed exclusively through education in general education classes with or without

individual accommodations, and needs special education and related services." WAC 392-172A-01035(1)(a).

18.    WAC 392-172A-03040(2) further underscores this requirement. This regulation specifies that a student must not be determined eligible based solely on lack of appropriate instruction in reading or math, or if the student does not otherwise meet the eligibility criteria of a disability, an adverse educational impact, and the need for SDI:

> (2)(a) A student must not be determined to be eligible for special education services if the determinant factor is:
>
> > (i) Lack of appropriate instruction in reading, based upon the state's grade level standards;
> >
> > (ii) Lack of appropriate instruction in math; or
> >
> > (iii) Limited English proficiency; and
>
> (b) If the student does not otherwise meet the eligibility criteria including presence of a disability, adverse educational impact and need for specially designed instruction.

19.    After comparison of the discrepancy in child find standards in district courts in the Ninth Circuit, I apply the standard that more closely aligns with the IDEA. Specifically, that a child find obligation is triggered when a school district has reason to suspect a disability, and reason to suspect the child needs special education services to address that disability. Thus, the question remains whether the District had reason to suspect, prior to February 1, 2024, that the Student was in need of special education services sufficient to trigger its child find responsibilities. After consideration of the facts, I conclude that the District did not have sufficient information to determine whether special education services were needed to address the Student's disabilities until February 2024.

20.    In this case, the record reflects that as of August 30 2023, the District received the Parent's request for a special education evaluation, and the August 2023 Dayspring Report, which contained the Student's diagnoses of ADHD, anxiety and SLDs of dyslexia, dysgraphia and dyscalculia. On September 7, 2023, the Parents informed the District that the Student was home schooled the prior year, and before that she had attended private school since kindergarten. On September 19, 2023, the Parents the District a copy of the August 2023 Dayspring Evaluation, which contained the data related to the Student's diagnoses.

Findings of Fact, Conclusions of Law, and Final Order
Cause No.  2024-SE-0160
Docket No. 11-2024-OSPI-02405
8612 - OSPI
Page 49

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA  98504-2489
(800) 845-8830
(206) 587-5135

21.     In September 2023, the District received additional limited information from the Parents about the Student's prior academics. The Student had attended private school between kindergarten and 5th grade, and was homeschooled during 6th grade. However, there was no record of what education the Student had or had not received, input from prior teachers, or any prior assessments. There was no record of her receiving any prior educational interventions, or any reported concerns from her prior school about her reading, writing or mathematics skills. Therefore, as of the Student's enrollment for the 2023-2024 school year, the District was only aware of the Student's disabilities. It had no information about the Student's prior educational performance, or whether her disabilities adversely impacted her school performance.

22.     When the Student's evaluation team met in October 5, 2023, the Student's 7th grade general education ELA teacher observed that the Student's reading and writing abilities were below average, and that she was currently earning an F. The Student was enrolled in Math Intervention, and earning a D in 7th grade math, and her math teacher was concerned with her ability to complete grade level content and retain learned content. All teachers noted that the Student consistently earned low and failing grades in unit quizzes, that she did not have a lot of experience taking more comprehensive assessments and did not know how to study for the tests, and that she voiced anxiety over taking tests.

23.     However, the Student's ELA teacher also observed that struggles with ELA were not uncommon for early 7th grade students. Mr. Kelly further noted that the Student's struggles with math were consistent with the Student only receiving online instruction in math the prior year. There was also no record that the Student had ever previously taken comprehensive assessments or tests, including any state-wide or District-wide assessments, to measure her grade-level performance. As it was only four weeks into the school year, it was unclear whether the Student's performance was impacted primarily by her prior educational instruction and lack of any interventions, or her disabilities. At this time, it was reasonable for the District to wait and obtain additional information about the Student's academic and classroom performance, including teacher observations, grades, and District wide assessments.

24.     On October 12, 2023, the District made the initial decision not to refer the Student for a special education evaluation. At that time, the District had no information regarding either the consistency of the Student's prior education, or the existence or effectiveness of any prior interventions that would indicate it was time to initiate a special education evaluation. It was reasonable for the District to wait until the Student received more instruction in the classroom and complete standardized assessments, to determine if special education services might be warranted.

Findings of Fact, Conclusions of Law, and Final Order
Cause No.  2024-SE-0160
Docket No. 11-2024-OSPI-02405
8612 - OSPI
Page 50

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA  98504-2489
(800) 845-8830
(206) 587-5135

25.     The District did not have this information until January 2024, when the Student completed the 2023-2024 MAP assessments and completed a semester of general education in ELA, and math with interventions and accommodations.

26.     On or around January 30, 2024, the Parents again requested a referral for a special education evaluation. By that time, the Student had received a semester of educational instruction, including 504 accommodations and a math intervention class. Nevertheless, these supports were not effective. The Student had also completed MAP Testing which, to the District's knowledge, was the first standardized assessment the Student had ever received.  Her Winter 2023-2024 MAP scores reflected a 7th grade Math score of 207 (17th percentile), and a Reading score of 201 (16th percentile/Lexile 710), representing a reading level of 3rd to 4th grade. Her 1st Quarter grades for 2023-2024 similarly reflected that the Student earned a C- in Math 7 and a P in Math Intervention, a D in Social Studies, a C in ELA, and a D+ in Science.

27.     The District reviewed the Student's grades and MAP testing, which indicated she struggled with retaining math information, and had gaps in grade level concepts, and struggled with writing complete and elaborated sentences using accurate convention. The District also reviewed input from the Student's teachers, and noted that she was not making academic progress despite her 504 accommodations and math intervention class. The District concluded an initial evaluation for special education would be appropriate. On February 1, 2024, the day after the Parent's referral request, the District informed the Parents it would refer the Student for a special education evaluation.

28.     In summary, the District initially had insufficient information that the Student's disability, rather than her prior educational instruction and interventions, impacted her academic performance and ability to access her education. The District waited a reasonable amount of time to permit the Student to receive general education instruction, including 504 accommodations and a math intervention class. When the Student's Winter 2023-2024 standardized testing, grades and teacher input reflected that these supports were ineffective, the District properly referred her for a special education evaluation. The District did not violate its child find obligations when it did not initiate a special education evaluation until February 1, 2024. Therefore, the District has met its burden on this issue.

**Whether the District violated the IDEA and denied the Student a FAPE by failing to provide the Student with an evidence-based, multisensory, structured literacy program for students with dyslexia, in any IEP, and implement it with fidelity (Issue #3)**

29.    The Parents additionally argue that in order to access her education, the Student required targeted reading intervention in the form of an evidence-based structured literacy curriculum designed for students with dyslexia. PB36-29.    The District responds that the IDEA does not require it to specify the teaching methodology it would use for the Student, and that her IEPs were reasonably calculated to provide educational benefit. DB29.

30.    After examining RCW 28A.320.260, its purpose, and its context to other provisions of the same act, I conclude that it requires multisensory structured literacy interventions for all students showing indications of below grade level literacy development, not just K-2 students. However, nothing in the statute requires Washington school districts to use any specific literacy interventions for students with dyslexia, nor does it require that literacy interventions include dyslexia-focused curriculum. Further, nothing in case law interpreting the IDEA outlines this requirement.

31.    The court's  fundamental objective in interpreting statutes "is to ascertain and carry out the Legislature's intent." (*quoting Dep't of Ecology v. Campbell & Gwinn, LLC.*, 146 Wn.2d 1, 9, 43 P.3d 4 (2002)). "[I]f the statute's meaning is plain on its face, then the court must give effect to that plain meaning as an expression of legislative intent." *Dep't of Ecology*, 146 Wn.2d at 9-10. In order to determine the plain meaning, we consider the statute in context to related statutes and "other provisions of the same act in which the provision is found." *Id.* at 10 (citing *In re Estate of Lyons v. Sorenson*, 83 Wn.2d 105, 108, 515 P.2d 1293 (1973)).

32.    Chapter 28A.320 outlines Washington state school district powers and duties. RCW 28A.320.250, .260, and .270, enacted in 2018 pursuant to ESSB 6162, are the only three provisions in the chapter which specifically address dyslexia, its identification and reporting requirements, and interventions.

33.    RCW 28A.320.250 defines dyslexia to mean "a specific learning disorder that is neurological in origin and that is characterized by unexpected difficulties with accurate or fluent word recognition and by poor spelling and decoding abilities that are not consistent with the person's intelligence, motivation, and sensory capabilities." This statute does not outline any interventions, or curriculum required to remediate dyslexia or support dyslexic students.

34.    RCW 28A.320.270 requires that "school districts that screen students for indicators of, or areas of weakness associated with, dyslexia," report to OSPI the number of students and grade levels of the students screened. This statute also

required the dyslexia advisory council convened under RCW 28A.300.710[19] to use this data when developing best practice recommendations. This statute does not outline any interventions, or curriculum required to remediate dyslexia or support dyslexic students.

35.  RCW 28A.320.260 requires identification of students with indications of dyslexia in grades K-2. This statute provides:

> Beginning in the 2021-22 school year, and as provided in this section, each school district must use multitiered systems of support to provide interventions to students *in kindergarten through second grade* who display indications of, or areas of weakness associated with, dyslexia. In order to provide school districts with the opportunity to intervene before a student's performance falls significantly below grade level, school districts must screen students in *kindergarten through second grade* for indications of, or areas associated with, dyslexia as provided in this section.

RCW 28A.320.260(1) (*emphasis added to original*).

36.  RCW 28A.320.260(3) further provides:

> (a) If a student shows indications of below grade level literacy development or indications of, or areas of weakness associated with, dyslexia, the school district must provide interventions using evidence-based multitiered systems of support, consistent with the recommendations of the dyslexia advisory council under RCW 28A.300.710 and as required under this subsection (3).
>
> (b) The interventions must be evidence-based multisensory structured literacy interventions and must be provided by an educator trained in instructional methods specifically targeting students' areas of weakness. . . .

37.  I find that the statute's meaning is plain on its face. RCW 28A.320.260(1) specifies that districts must screen to identify students in grades K-2 "who display indications of, or areas of weakness associated with, dyslexia." However, the statute further specifies that the district *must provide interventions* "[i]f a student shows indications of below grade level literacy development or indications of, or areas of

---

[19] RCW 28A.300.710 expired August 1, 2023.

Findings of Fact, Conclusions of Law, and Final Order
Cause No.  2024-SE-0160
Docket No. 11-2024-OSPI-02405
8612 - OSPI
Page 53

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA  98504-2489
(800) 845-8830
(206) 587-5135

weakness associated with, dyslexia." RCW 28A.320.260(3) (*emphasis added to original*). of RCW 28A.320.260(3)(a). This requirement is not grade limited. Had the legislature intended required interventions to apply only to grades K-2, it could have indicated so in the plain language of the RCW 28A.320.260.

38.    Nevertheless, RCW 28A.320.260(3)(b) does not outline any specific curriculum. It simply provides that "interventions must be evidence-based multisensory structured literacy interventions." The statute does not require any specific interventions, or require that literacy interventions include dyslexia-focused curriculum.

39.    This interpretation is further supported by the language of OSPI's Dyslexia Guidance for implementing MTSS for literacy. This publication was created as a guide to support schools in implementing ESSB 6162.[20] As outlined above, the Dyslexia Guidance focuses on the identification of reading difficulty in students in grades K-2, such as dyslexia.  The dyslexia advisory counsel was further tasked with identifying best practices to address the needs of students above grade 2 who show indications of, or areas of weakness associated with, dyslexia.[21] However, the guidance does not outline any specific intervention or curriculum required to be provided by the districts, or specify that the intervention be specifically designed for students with dyslexia.

40.    The Ninth Circuit Court of Appeals has consistently held that school districts are "entitled to deference in deciding what programming is appropriate as a matter of educational policy." *Crofts v. Issaquah Sch. Dist. No. 411*, 22 F.4th 1048, 1056 (9th Cir. 2022). Districts need not specify an instructional method unless that method is necessary to enable a student to receive a FAPE. *Crofts,* at 1057 (citing *J.L. v. Mercer Island*, 592 F.3d at 952). Rather, to meet its substantive obligations, a district must merely provide an IEP that is "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Id.* (citing Endrew F., 137 S. Ct. at 1001).

41.    As the court in *J.L. v. Mercer Island Sch. Dist.*, 592 F.3d at 952, explained:

> Although school districts should specify a teaching methodology for some students, for other students IEPs may not need to address the instructional method to be used because specificity about methodology

---

[20] ESSB 6162 created RCW 28A.320.250, .260, and .270. *See also*, prior RCW 28A.300.710 (dyslexia advisory council convened to advise districts on interventions).

[21] RCW 28A.300.710. *See also*, ESSB 6162, Sec 5(d).

Findings of Fact, Conclusions of Law, and Final Order
Cause No.  2024-SE-0160
Docket No. 11-2024-OSPI-02405
8612 - OSPI
Page 54

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA  98504-2489
(800) 845-8830
(206) 587-5135

is not necessary to enable those students to receive an appropriate education. *See* 64 Fed. Reg. 12,552. We accord deference to the District's determination and the ALJ's finding that [the student's] teachers needed flexibility in teaching methodologies because there was not a single methodology that would always be effective. We hold that the District did not commit a procedural violation of the [IDEA] by not specifying teaching methodologies in [the Student's IEPs] . . . .

*Id.* at 952; see also *R.P. v. Prescott Unified Sch. Dist.*, 631 F.3d 1117, 1122 (9th Cir. 2011) ("IDEA accords educators discretion to select from various methods for meeting the individualized needs of a student, provided those practices are reasonably calculated to provide him with educational benefit).

42.     To determine whether a certain methodology is "necessary" for a student to receive appropriate, individualized education, the reasoning in *Rogich v. Clark Cty. Sch. Dist.*, 2018 U.S. Dist. LEXIS 55203, 2018 WL 1568673 (D. Nev., Mar. 31, 2018), is instructive. *Rogich* concerned a student with multiple severe disabilities, including hydrocephalus at birth; Executive Function Deficit; Attention Deficit Hyperactivity Disorder; Developmental Dyslexia; Developmental Mathematics Disorder; a Nonverbal Learning Disorder; Generalized Anxiety Disorder; Dysthymic Disorder; and Mixed Receptive-Expressive Language Disorder. *Rogich*, *4-5.

43.     In *Rogich*, the student's 2014 and 2016 IEPs simply specified that the student would receive a "multisensory approach to teaching" throughout the day, without additional detail. *Rogich*, *6. The Parents argued that the student's IEP team was instead required to include "the Orton-Gillingham methodology, or similar program" in the IEP. *Rogich, *16. Although *Rogich* court denied that the district was required to provide the Orton-Gillingham method, it found that the Parents presented compelling professional evidence, unrefuted or challenged by the District, which established that the student's unique needs required a specific methodology in order to receive a FAPE:

The evaluations did not only call for multisensory instruction. Rather, they stressed the importance of the delivery mechanism by which O.R. would receive that instruction. The 2009 Pettigru evaluation stated, "Methodology will be a key factor in improving [O.R.'s] academic standing. [O.R.] will respond best to instructional programs that provide simultaneous, multisensory instruction (VAKT), and are also systematic and cumulative." The 2013 Pettigru evaluation repeats this instruction verbatim, and additionally states that, "Unless [O.R.] has multimodality teaching, i.e., a combination of visual, auditory, tactile, and kinesthetic stimuli, she will most likely have difficulty in academic settings,

Findings of Fact, Conclusions of Law, and Final Order
Cause No.  2024-SE-0160
Docket No. 11-2024-OSPI-02405
8612 - OSPI
Page 55

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA  98504-2489
(800) 845-8830
(206) 587-5135

especially as the academic tasks become more abstract." Dr. DaSilva's report states that "[O.R.] will continue to require intensive multimodal, research-based learning programs for reading comprehension and math." Dr. DaSilva elaborated on this recommendation in his testimony before the IHO. In response to the question as to whether it matters how the multisensory or multimodality approach is implemented, he testified that it did, that "it should be a program approach . . . there should be a methodology to it. There should be a philosophy to it and one that is applied with really rigorous consistency." Dr. DaSilva went on to illustrate that the provision of multiple methodologies throughout the day can result in confusion for a child, id. at 534:1-7, and that it is therefore important to ensure "the techniques are being used with consistency and fidelity throughout the day,"

*Rogich*, *19-21 (citations to the record omitted).

44.    The *Rogich* court concluded "[t]his is not to say that she necessarily required the Orton-Gillingham methodology, but she did require an *equivalent methodology* that was a) research-based, b) systemic, c) cumulative, and d) rigorously implemented." *Rogich*, *22-23 (*emphasis added to original*). Therefore, the court found the District denied the student FAPE when the IEP only specified the student would receive a "multi-sensory approach to teaching." *Id.*

45.    In *Crofts*, the parents similarly asserted the district should have used the Orton-Gillingham approach with their dyslexic student, arguing that she would have progressed more in reading had she been taught using this method. *Crofts v. Issaquah Sch. Dist. No. 411*, 22 F.4th at 1056. The student had received a private evaluation prior to her 2nd grade year which indicated that she "demonstrated a pattern of academic and cognitive strengths and weaknesses consistent with th[e] classic profile of the specific learning disability of dyslexia." *Crofts*, at 1051. The IEP provided 40 minutes of reading and writing instruction per day in a special-education classroom, and a variety of reading programs including programs with multi-sensory approaches designed for students who have difficulty reading. *Crofts*, at 1052. The *Crofts* court found that the student's IEPs goals were based on numerous reading and writing assessments conducted by the District and the parents' outside evaluator, were reasonably calculated to target the specific areas in which the student struggled, and that she made reasonable progress in light of her circumstances without using the Orton-Gillingham approach. *Id.* at 1057. Based on this record, the *Crofts* court concluded that the parents were unable to demonstrate that Orton-Gillingham, in particular, was "necessary" for the student to receive appropriate, individualized instruction. *Id.*

Findings of Fact, Conclusions of Law, and Final Order
Cause No.  2024-SE-0160
Docket No. 11-2024-OSPI-02405
8612 - OSPI
Page 56

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA  98504-2489
(800) 845-8830
(206) 587-5135

**April 2024 IEP and May 2024 Amended IEP**

46.   In the present case, both the April 2024 IEP and the May 2024 Amended IEP, denied the Parents' requests that the District provide the Student with "evidence-based, multisensory, structured literacy program *designed for students with dyslexia* taught by someone qualified to deliver the program and be fully trained in its use" (*emphasis added to original*). The District also rejected the Parent's requests that the District offer a literacy program similar to the Barton or Orton-Gillingham method.

47.   However, neither Dr. Bode's August 2023 Dayspring Evaluation, nor her August 2023 Dayspring Report, recommended any specific type of literacy or writing instruction, or specified that the Student must receive a dyslexia-focused curriculum in order to make progress. Rather, the August 2023 Dayspring Report included 10 ½ pages from a "template bank" of school recommendations, which Dr. Bode had not narrowed down to the recommendations specific to the Student.

48.   Among other recommendations, the August 2023 Dayspring Report specified that the Student had "potential to make adequate strides in reading provided she has access to specific targeting reading intervention programs that hit all five pillars of the early reading process (phonemic awareness, phonics, fluency, vocabulary and comprehension)." The report further noted that the Student "would benefit most from using multiple intervention strategies that improve her speed and fluency, develop vocabulary knowledge, and teach more strategies for comprehension," including natural reading opportunities, computer pacing, multisensory mastery, phonological flashcards, and audio books. However, none of these general recommendations and suggestions specified that a certain methodology, or a specific dyslexia-based curriculum, was "necessary" for the Student to receive a FAPE.

49.   The District's February 2024 special education evaluation similarly outlined multiple possible interventions for reading and writing including, but not limited to: identifying and decoding digraphs and blends commonly found in grade level words; development of sight vocabulary; answering comprehension questions using evidence from text; constructing a complete paragraph using accurate conventions; and constructing a logical and well organized essay. The February 2024 evaluation similarly did not recommend any specific IEP goals, a specific curriculum, or that the curriculum be dyslexia-based.

50.   In sum, the evidence does not reflect that as of April 2024 or May 2024, a dyslexia-based curriculum or methodology was "necessary" for the Student to receive appropriate, individualized education. *Crofts,* at 1057. Therefore, the District did not deny the Student a FAPE by not outlining in either her April 2024 IEP, or May 2024

Findings of Fact, Conclusions of Law, and Final Order
Cause No.  2024-SE-0160
Docket No. 11-2024-OSPI-02405
8612 - OSPI
Page 57

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA  98504-2489
(800) 845-8830
(206) 587-5135

Amended IEP, an "evidence based, multisensory, structured literacy program designed for students with dyslexia," or a program similar to Barton or Orton-Gillingham. The District has met its burden on this issue.

### October 2024 Amended IEP

51.   The October 2024 Amended IEP did not contain any requests by the Parents to include any specific methodology for teaching reading, or any dyslexia-based curriculum. Further, the Student received no additional evaluations regarding her reading skills or educational needs until November 2024. As there was no request for any specific methodology or curriculum to be included in the October 2024 IEP, and no evidence that any specific methodology or curriculum was required as of October 2024, there is no evidence that the IEP was inappropriate on this basis. The District has met its burden on this issue.

### January 2025 Parent Request for Dyslexia Curriculum

52.    While the District did not develop any IEPs after October 2024, the Parents further argue that the District failed to offer existing dyslexia-based curriculum after multiple requests to provide such a curriculum in November 2024 and January 2025. The Parents argue that its expert witnesses agreed that the Student "requires" such a curriculum. PB40-41. This argument also fails.

53.    On November 19, 2024, the Parents asked the District whether the Developmental ELA utilized evidence-based structured literacy curriculum. The District responded on January 8, 2025, indicating that the Developmental ELA used the general education curriculum "Collections", and adapted the content, methodology or delivery of instruction to address the Student's individual needs. The District also indicated that it would use "Vocabulary Surge" by 95 Percent Group, that SDI would be delivered in small-group or 1:1 by a special education teacher or paraeducator under the supervision of a special education teacher, and teachers in the classroom had received dyslexia training.

54.    On January 10, 2025, the Parents responded that neither "Collections" by Houghton Mifflin, nor "Vocabulary Surge" by 95 Percent Group, qualified as multisensory structured literacy based interventions effective for students with dyslexia. The Parents indicated that Houghton Mifflin offered a dyslexia-based curriculum called "Read 180", and 95 Percent Group also offered a dyslexia-based curriculum called "95 RAP."

Findings of Fact, Conclusions of Law, and Final Order
Cause No.  2024-SE-0160
Docket No. 11-2024-OSPI-02405
8612 - OSPI
Page 58

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA  98504-2489
(800) 845-8830
(206) 587-5135

55.    The IEP team met on January 13, 2025. The IEP team did not change any of the SDI outlined in the October 2024 Amended IEP. The District also rejected the Parent's request to provide a specific dyslexia curriculum such as "95 RAP." Rather, the District specified that the curriculum used in Developmental ELA, "Collections," "Vocabulary Surge" and "Multisyllabic Routine Cards", were sufficiently adapted by the learning specialist to include multisensory learning.

56.    Parents argue that at no time during these conversations did the District inform it that it offered the "Read 180" curriculum in an Intervention ELA class. The Parents also point to the November 2024 evaluation by Dyslexia on Demand to argue that the Student required an evidence-based, multisensory, structured literacy program for students with dyslexia. The Parents also rely on a January 13, 2025, progress report from Take Flight which indicated that the Student had made progress in recognizing and identifying sounds within words while reading and spelling, and had increased her reading fluency on 5th grade level passages.

57.    The record does not reflect that the Parents sent the November 2024 evaluation to the District. Nevertheless, the evaluation did not specify that an Orton-Gillingham approach was required for the Student to learn to read. Rather, the evaluation specified that an Orton-Gillingham reading instruction program would "help remediate" the Student's reading and comprehension weaknesses. Similarly, the Student's January 2025 Take Flight progress reports did not specify that the Student required an Orton-Gillingham or similar reading instruction.

58.    Finally, the Parents also rely on testimony at hearing by Dyslexia on Demand expert witnesses. At hearing, Ms. DeAeth, who conducted the Student's November 2024 evaluation by Dyslexia on Demand, asserted that the Student had moderate to severe dyslexia, which could be remediated to mild if gaps in learning were filled in. Ms. DeAeth emphasized that dyslexia curricula influenced by the Orton-Gillingham method would be the most appropriate. However, Ms. DeAeth did not testify that the Student required this type of curriculum to make progress in reading.

59.    Ms. Blaylock acknowledged at hearing that many different structured literacy programs exist, and that no specific program is necessary to remediate dyslexia. Ms. Blaylock opined that based on the Student's diagnoses and current progress, she requires a consistent and repetitive daily program to support her readings skills, preferably in a private environment, as she might be reluctant to practice her skills in a mainstream classroom. However, Ms. Blaylock did not testify that the Student required a specific curriculum.

60.     Ms. Espino opined at hearing that all dyslexic students require a curriculum based on the Orton-Gillingham method. As outlined above, I accorded little weight to this opinion, as the conclusion was made without any additional explanation, and the Student's November 2024 evaluation did not specify that the Student required Orton-Gillingham to learn to read.

61.     Therefore, the evidence does not reflect that even as of January 2025, a specific dyslexia-based methodology was "necessary" for the Student to receive FAPE. Given OSPI's endorsement of a structured literacy approach, it is unclear why the IEP cannot be appropriate unless it includes a statement that the Student needs a specific structured literacy approach geared toward dyslexic students to receive a FAPE. The key question is whether the IEP is reasonably calculated to enable the Student to make progress in light of his circumstances. See *Crofts*, 22 F.4th at 1057; see also *H.R. v. District of Columbia*, 2024 U.S. Dist. LEXIS 57101 (D.D.C. Mar. 29, 2024)(IEPs provided sufficient specificity to provide for a FAPE without reference to specific reading methodology). That issue is addressed in further detail below.

62.     In sum, the District did not violate the IDEA by failing to identify in any of the Student's IEPs a specific "evidence based, multisensory, structured literacy program designed for students with dyslexia" or a specific dyslexia-based methodology for the Student.

**Whether the District violated the IDEA and denied the Student a FAPE by failing to consider the Parents' Spring 2024 request for a specific intervention to address the Student's specific learning disability (dyslexia and dyscalculia) (Issue #2)**

63.     The Parents argue that the District improperly failed to consider the Parents' multiple requests for specific interventions to address the Student's specific learning disabilities, and that the District summarily denied the requests. PB4-45. The District responds that the law does not require it to provide the Student with specific educational intervention, only that parents be allowed to meaningfully participate in developing an IEP. DB27.

64.     "A school district violates IDEA procedures if it independently develops an IEP, without meaningful parental participation, and then simply presents the IEP to the parent for ratification." *Ms. S. v. Vashon Island Sch. Dist.*, 337 F.3d 1115, 1131 (9th Cir. 2003) (citing W.G. v. Board of Trustees of Target Range School Dist. No. 23, 960 F.2d 1479, 1484 (9th Cir. 1992). However, districts have no obligation to grant parents a veto right over any individual provision in an IEP.  *Ms. S.*, 337 F.3d at 1131. "If the parties reach a consensus, of course, the [IDEA] is satisfied and the IEP goes into effect. If not, the agency has the duty to formulate the plan to the best of its ability

Findings of Fact, Conclusions of Law, and Final Order
Cause No.  2024-SE-0160
Docket No. 11-2024-OSPI-02405
8612 - OSPI
Page 60

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA  98504-2489
(800) 845-8830
(206) 587-5135

in accordance with information developed at [prior] meetings, but must afford the parents a due process hearing in regard to that plan." *Doe v. Maher*, 793 F.2d 1470, 1490 (9th Cir. 1985) (internal citation omitted).

65.     School districts are generally entitled to deference in deciding what programming is appropriate for a student. *J.L. v. Mercer Island Sch. Dist.*, 575 F.3d at 1031, n.5. For that reason, IEPs need not address the instructional method to be used unless a specific methodology is necessary for a student to receive an appropriate education. *See id*. at 1039; see also *Department of Education, Analysis of Comments and Changes to IDEA Regulations*, 71 Fed. Reg. 46665 (2006) (nothing in IDEA requires IEP to include specific methodology; methods may be addressed in IEP if necessary for child to receive FAPE).

66.     In this case, during the April 19, 2024 IEP meeting, the Parents requested that the school provide an "[e]vidence-based, multisensory, structured literacy program designed for students with dyslexia taught by someone qualified to deliver the program and be fully trained in its use. The program shall be delivered in the scope and sequence intended by its designers, including use of the program's assessments and progress monitoring tools (Barton, Orton Gillingham, etc.)." In an April 24, 2024 letter to the District, the Parents also requested that the Student receive "[m]ath instruction by an educator who is educated and trained on dyscalculia."

67.     The District's PWN dated April 25, 2024, rejected the Parents' request for an evidence-based, multisensory, structured literacy program designed for students with dyslexia taught by someone qualified to deliver the program and fully trained in its use. The PWN also rejected the Parents' request for 1:1 or 2:1 math teacher, responding that "[m]ath teachers are certified to teach math to all students."

68.     The record reflects that while the District did not agree to these specific requests, the District considered the requests before rejecting them. As outlined above, the District was not required to identify a specific program or curriculum for the Student. Further, the IEP team appropriately responded that the teachers provided to the Student were qualified to provide reading, writing and math instruction.

69.     The District also agreed to many of the Parents' requests in the final IEP. Both the April 2024 IEP and May 2024 Amended IEP specified that the Student would receive SDI from educational staff/paraeducators in the general education setting, monitored by a learning specialist. This was based on the Parents' specific request that the Student remain in the general education setting. The District also accepted the Parents' requests that the Student not attend the math intervention class; that

Findings of Fact, Conclusions of Law, and Final Order
Cause No.  2024-SE-0160
Docket No. 11-2024-OSPI-02405
8612 - OSPI
Page 61

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA  98504-2489
(800) 845-8830
(206) 587-5135

reading reflect the scope and sequence of the District's chosen program in annual goals; and that the District specify a mechanism by which goal progress was regularly communicated to all staff delivering reading instruction.

70.    The District also added as accommodations the Parents' requests that the Student receive as many edits and redo's  in ELA as possible without her getting frustrated; use a calculator for everything; receive notes from class in ELA; receive access to speech to text/text to speech in all classes; listen to music on headphones during non-instruction time in class; leave classroom for breaks as; no reduction in grades for spelling errors, except on a spelling test; and to receive extended time, multiple or frequent breaks/change of schedule or order of activities.

71.    Finally, the record reflects that as of Spring of 2024, the Student had significant gaps in Basic Reading, Reading Comprehension, Written Expression, and Mathematic Problem Solving skills. However, the District had no information about her prior educational content or delivery, the existence of any previous educational interventions, any specific methodologies previously used with the Student, whether they were effective, or whether she received any education aligned to the general education curriculum. Therefore, the District had wide discretion to determine which curriculum to use with the Student and was not required to adopt a specific curriculum in the Student's IEP.

72.    In sum, as of Spring 2024, the District collaborated with the Parents to create an IEP. The District considered the Parents' requests for specific interventions for her dyslexia and dyscalculia, but validly rejected them. The District was entitled to deference in determining the appropriate educational programing and delivery of SDI in basic reading, reading comprehension and math. *J.L. v. Mercer Island Sch. Dist.*, 575 F.3d at 1039.  It had no obligation to grant the Parents a veto right over any individual provision in the IEP.  *Ms. S.*, 337 F.3d at 1131. Therefore, the District has met its burden on this issue.

**Whether the District violated the IDEA and denied the Student a FAPE by failing to offer appropriate SDI in the Student's April 2024 IEP, or May 2024 Amended IEP, that was reasonably calculated to confer meaningful educational benefit to the Student by failing to appropriately consider or adopt the evaluative data and recommendations of Dayspring Behavioral Health/Dr. Tammara Bode (Issues #6 and #7)**

73.    The Parents argue that neither the April 2024 IEP, nor the May 2024 Amended IEP, were appropriate because they did not consider Dr. Bode's recommendations regarding the amount of SDI or that she needed evidence-based multisensory structured literacy instruction. PB46. In response, the District asserts that both the

April 2024 IEP and May 2024 Amended IEP provided the Student sufficient and appropriate SDI, and it properly relied on the specific recommendations of its own special education evaluation and special education teachers rather than Dr. Bode's long list of standard recommendations. DB32.

74.     As outlined above, the Parents were not entitled to any specific literacy curriculum. However, I agree with the Parents that neither the April 2024 IEP, nor the May 2024 Amended IEP, offered the Student appropriate SDI reasonably calculated to confer meaningful educational benefit to the Student. I reach this conclusion primarily because the minimal amount of SDI offered, only 10 minutes per week in Basic Reading and Reading Comprehension, 10 minutes in Writing, and 10 minutes in Mathematics, was insufficient to help her advance toward her IEP goals considering her deficiencies in these areas and present levels of performance.

75.     WAC 392-172A-03110(1) requires an IEP team, in developing an IEP, to consider the student's strengths; the student's most recent evaluation results; the academic, developmental, and functional needs of the student; and the parents' concerns for enhancing the student's education.

76.     An IEP must contain "[a] statement of the student's present levels of academic achievement and functional performance," which includes how the student's disability affects their involvement and progress in the general education curriculum. WAC 392-172A-03090(1)(a).

77.     Additionally, an IEP must contain a statement of measurable annual goals, including academic and functional goals designed to meet the student's needs that result from her disability to enable her to be involved in and make progress in the general education curriculum and meet each of her other educational needs that result from her disability.  WAC 392-172A-03090(1)(b)(i); 34 § CFR 300.320(a)(2). There must be a relationship between the present levels of performance and the goals and objectives. *Seattle Sch. Dist.,* 34 IDELR 196, 34 LRP 226 (SEA WA 2001).

78.     An IEP must include a description of how the district will measure the student's progress toward meeting the annual goals set forth in the IEP as well as when the district will provide periodic reports on the progress the student is making toward meeting annual goals. WAC 392-172A-03090(1)(c).

79.     The IDEA does not specify the number of goals that must be included in an IEP, but there should typically be at least one goal for each area of need.  *See, e.g., Bellflower Unified Sch. Dist.*, 54 IDELR 66 (SEA CA 2010) (IEP deficient because it did not contain goals to address student's deficits in attending to group instruction);

*Flagstaff Arts and Leadership Academy*, 113 LRP 27180 (SEA AZ 2013) (IEP deficient because it failed to provide goals to properly address basic reading, reading fluency, life skills, and other areas of need).  An IEP also need not contain every goal requested by a parent or recommended by the parent's experts.  *See G.D. v. Torrance Unified Sch. Dist.*, 112 LRP 12078 (C.D. Cal. 2012) (IEP goals not inappropriate where the district included goals addressing the student's significant needs while excluding those it deemed unnecessary or not age appropriate).

80.    The educational benefits flowing from an IEP must be determined from the combination of offerings rather than the single components viewed apart from the whole. *See, e.g., Karl v. Bd. of Educ. of Geneseo Cent Sch. Dist.,* 736 F.2d 873, 877 (2nd Cir 1984); *Palo Alto Unified Sch. Dist.,* 118 LRP 21969 (CA SEA 2018) (citing *J.M. v. New York City Dep't of Education,* 171 F. Supp. 3d 236, 247-48 (S.D.N.Y. 2016)("An IEP must be considered as a whole; its individual parts cannot be judged in isolation.").

81.    The determination as to whether an IEP is reasonably calculated to offer a student FAPE is a fact-specific inquiry that must focus on the unique needs of the student at issue. "A focus on the particular child is at the core of the IDEA," and an IEP must meet a child's "*unique* needs." *Endrew F.,* 137 S. Ct. at 999 (emphasis in original). "Any review of an IEP must appreciate that the question is whether the IEP is *reasonable*, not whether the court regards it as ideal." *Id*. (*emphasis in original*). The determination of reasonableness is made as of the time the IEP was developed, because an IEP is "a snapshot, not a retrospective." *Adams*, 195 F.3d at 1149.

82.    SDI means adapting, as appropriate to the needs of an eligible student, the content, methodology, or delivery of instruction to address the student's unique needs that result from the student's disability and to ensure access of the student to the general education curriculum.  WAC 392-172A-01175(3)(c); 34 CFR §300.39(b)(3). There is no requirement that the Student receive specific instructional content, methodology, or curriculum. Only that the content, methodology, or delivery be adapted so that the Student receives access to the general education curriculum. WAC 392-172A-01175(3)(c).

83.    Finally, the IEP must outline an educational program which provides "merely more than *de minimis*" progress. As stated by the Supreme Court in *Endrew F.:*

> When all is said and done, a student offered an educational program providing "merely more than *de minimis*" progress from year to year can hardly be said to have been offered an education at all. For children with disabilities, receiving instruction that aims so low would be tantamount

Findings of Fact, Conclusions of Law, and Final Order
Cause No.  2024-SE-0160
Docket No. 11-2024-OSPI-02405
8612 - OSPI
Page 64

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA  98504-2489
(800) 845-8830
(206) 587-5135

to "sitting idly awaiting the time when they were old enough to 'drop out'"
… The IDEA demands more. It requires an educational program
reasonably calculated to enable a child to make progress appropriate in
light of the child's circumstances.

*Endrew F.*, at 1001 (citations omitted).

84.     In this case, in August 2023, Dr. Bode diagnosed the Student with dyslexia,
dysgraphia, dyscalculia, ADHD and anxiety. The August 2023 KTEA-3 reflected that
the   Student received "Below Expected" scores in Writing Fluency, Reading
Comprehension, Spelling, Math Composite and Math Concepts and Applications, and
"Slightly Below Expected" scores in Reading Composite, and Math Computation.
Among other recommendations, Dr. Bode's August 2023 Dayspring Report specified
that the Student "would benefit from a reading, writing and mathematics intervention
program that is administered 4-5 days per week for a minimum of 40-45 minutes per
day," and also specified the Student "would benefit from targeted math instruction
administered 4-5 days per week for a minimum of 20-30 minutes per day." Dr. Bode
further indicated that the Student had "potential to make adequate strides in reading
provided she has access to specific targeting reading intervention programs that hit
all five pillars of the early reading process (phonemic awareness, phonics, fluency,
vocabulary and comprehension)."

85.     At the beginning of 2023-2024 school year, the District enrolled the Student
in a math intervention class. In October 2023, the District additionally approved a 504
plan which included several accommodations including, but not limited to, breaking
down assignments into manageable chunks, visual cues or written directions for work,
copies of notes, shortened or modified tasks, and access to text to speech and speech
to text on assignments and assessments.

86.     However, these interventions proved ineffective. During 1st Quarter 2023-
2024, the Student earned a C in ELA, C- in Math 7 and a P in Math Intervention, a D
in Social Studies, and a D+ in Science. District Winter 2023-2024 MAP testing
reflected that the Student read at a 3rd to 4th grade level, and performed in the 17th
percentile in math. The Student struggled with retaining math information, had gaps
in grade level concepts, and struggled with writing complete and elaborated
sentences using accurate convention. Teachers reported in January 2024 that the
Student was not making academic progress despite her 504 accommodations and
math intervention class.

87.     In February 2024, the District conducted a special education evaluation.
Similar to the August 2023 KTEA-3, the February 2024 WJ-IV reflected that the

Student received "Low Average" scores in Basic Reading, Reading Comprehension, and Reading Fluency, a "Low" Broad Written Language score, and a "Very Low" Math Problem Solving Score. The special education evaluation reflected that the Student struggled with decoding digraphs and blends in common words, had trouble with digraphs in nonsense words, and struggled with the process of breaking the word down into syllables, decoding the syllables, and reconstructing the syllables to read and understand passages. The Student was unable to read and understand some of the more complex words independently to understand the meaning of the text.

88.    The February 2024 special education evaluation indicated that the Student's difficulties with phonology (digraphs and blends) impacted her ability to spell correctly, and her writing lacked elaboration and detail for her age. The Student struggled to construct a complete paragraph on her own, and was not demonstrating independent understanding of writing a topic sentence or constructing a paragraph. The February 2024 WJ-IV further reflected that the Student was missing foundational math skills, was not firm in her math vocabulary and was unsure when discerning needed from unneeded information in a word problem.

89.    The District concluded that SDI was warranted in basic reading, reading comprehension, math problem solving, and written language. The February 2024 special education evaluation recommended multiple possible interventions for reading, math and writing including, but not limited to: identifying and decoding digraphs and blends commonly found in grade level words; development of sight vocabulary; answering comprehension questions using evidence from text; constructing a complete paragraph using accurate conventions; constructing a logical and well organized essay; understanding math vocabulary; and identifying the multi-step process for solving word problems. The evaluation did not recommend specific IEP goals, a specific methodology, or a specific amount of SDI, relying instead on educators to craft appropriate goals and SDI.

90.    In April 2024 and May 2024, the District offered IEPs which contained goals in Basic Reading,  Reading Comprehension, Written Language and Mathematics Problem Solving. These goals focused on the Student's deficits as identified in the February 2024 special education evaluation, as required by WAC 392-172A-03090(1)(a). The goals were also measurable and designed to assist the Student make progress in the general education curriculum, as required by WAC 392-172A-03090.

91.    Both the April 2024 and May 2024 Amended IEPs included a Basic Reading goal to focus on blends and digraphs, and to improve decoding skills from an undemonstrated accuracy level to 75% accuracy at the 4th grade level. Both the IEPs

included a Reading Comprehension goal to answer inferential questions in informational text from an undemonstrated accuracy level to at least 60% accuracy. Thus, both goals appropriately focused on the Student's limitations as identified in the special education evaluation, and identified specific measurable goals.

92.     Both the April 2024 and May 2024 Amended IEPs included math goals in problem solving, specifically multi-step word problems with 4 basic operations, and 1-step algebraic equations, with a goal to solve equations with 60% accuracy. Thus, both goals appropriately focused on the Student's limitations as identified in the special education evaluation, and identified specific measurable goals.

93.     Nevertheless, the special education and related services matrix outlined in both the April 2024 IEP and the May 2024 Amended IEP provided only 30 minutes each week to meet all goals: 10 minutes/week in concurrent SDI for Basic Reading and Reading Comprehension, 10 minutes/week in SDI for Written Language, and 10 minutes/week in SDI in Math Problem Solving. This miniscule amount of SDI was insufficient to meet the Student's needs.

94.     The District does not dispute that as of August 2023, when Dr. Bode completed her evaluation, the Student had significant performance gaps in basic reading, reading comprehension, writing and math. The District does not dispute that on the 2023-2024 Winter MAP testing, the Student received Math score of 207 (17th percentile), and a Reading score of 201 (16th percentile/Lexile 710), reflecting a reading level of 3rd to 4th grade. The District does not dispute that the Student's performance gaps continued through February 2024, when the District initiated its evaluation. This was despite the fact that the Student had received 504 accommodations and a math intervention class since at least October 2023.

95.     The District also does not dispute that Dr. Bode's August 2023 Dayspring Report specified that the Student "would benefit from a reading, writing and mathematics intervention program that is administered 4-5 days per week for a minimum of 40-45 minutes per day," and that she further specified the Student "would benefit from targeted math instruction administered 4-5 days per week for a minimum of 20-30 minutes per day."  While the District's February 2024 special education evaluation did not recommend a specific amount of SDI, it also did not specifically reject Dr. Bode's proposals as inappropriate.

96.     SDI must be calculated to enable a Student to make progress in light of their circumstances. The IEP must outline an educational program which provides more than "de minimis" progress. *Endrew F.*, at 1001. Despite the Student's diagnoses of dyslexia, dysgraphia, dyscalculia and ADHD, and significant performance gaps in

reading, writing and math which had existed since at August 2023, in April 2024 the District offered the Student only 30 minutes total SDI per week to meet all goals in Basic Reading, Reading Comprehension, Written Language, and Mathematics Calculation.

97.    Considering the Student's significant performance gaps in basic reading, reading comprehension, written language, and math problem solving, the fact that her skills were not improving despite interventions provided by the District since at least October 2023, and the undisputed recommendations by Dr. Bode, it is difficult to comprehend how a only 30 minutes for the whole week, with only 10 minutes dedicated to Basic Reading and Reading Comprehension, could be reasonably calculated to enable the Student to make reasonable progress her reading, writing and math goals in light of her circumstances. Based on these facts, I conclude that the amount of SDI in the April 2024 and May 2024 IEPs was insufficient and the IEPs were inappropriate.

98.    In conclusion, the District violated the IDEA and denied the Student a FAPE when it failed to offer her appropriate SDI in both the April 2024 and May 2024 Amended IEPs that was reasonably calculated to confer meaningful educational benefit to the Student. The District has not met its burden on this issue.

**Whether the District violated the IDEA and denied the Student a FAPE by failing to offer appropriate SDI in the Student's October 2024 IEP that was reasonably calculated to confer meaningful educational benefit to the Student by failing to appropriately consider or adopt the evaluative data and recommendations of Dayspring Behavioral Health/Dr. Tammara Bode (Issue #5)**

99.    The Parents similarly argue that the October 2024 Amended IEP was insufficient because it failed to consider Dr. Bode's report and recommendations. PB47. In response, the District asserts that it was not required to adopt Dr. Bode's report and instead appropriately relied on its own assessment of the Student. DB35. The District further argues that the October 2024 Amended IEP provided appropriate SDI in amounts similar to what was recommended by Dr. Bode. *Id.* I conclude that while District's October 2024 IEP process violated some IDEA procedural requirements, it provided appropriate SDI to the Student and thus the procedural violations did not result in a denial of FAPE.

100.    As outlined above, an IEP must consider how the student's disability affects their involvement and progress in the general education curriculum. WAC 392-172A-03090(1)(a). The IDEA requires an educational program "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances."

Findings of Fact, Conclusions of Law, and Final Order
Cause No. 2024-SE-0160
Docket No. 11-2024-OSPI-02405
8612 - OSPI
Page 68

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA 98504-2489
(800) 845-8830
(206) 587-5135

*Endrew F.*, at 1001. Whether an IEP is reasonably calculated to offer a student FAPE focuses on the "*unique* needs" of the student at issue. *Id.* at 999 (*emphasis in original*).

101.    An IEP must contain "[a] statement of the student's present levels of academic achievement and functional performance," which includes how the student's disability affects their involvement and progress in the general education curriculum. WAC 392-172A-03090(1)(a). Additionally, an IEP must contain a statement of measurable annual goals, including academic and functional goals designed to meet the student's needs that result from her disability to enable her to make progress in the general education curriculum.    WAC 392-172A-03090(1)(b)(i); 34 § CFR 300.320(a)(2).

102.    Procedural violations of the IDEA amount to a denial of FAPE and warrant a remedy only if they impeded the child's right to a free appropriate public education; significantly impeded the parents' opportunity to participate in the decision-making process regarding the provision of a free appropriate public education to the parents' child; or caused a deprivation of educational benefits. USC §1415(f)(3)(E)(ii); see WAC 392-172A-05105(2); 34 CFR §300.513(a)(2).

103.    In the present case, in creating the October 2024 IEP, the District did not include her current testing results. The October 2024 Amended IEP only included the Student's Winter 2023-2024 MAP scores, and did not include either the Student's Spring 2024 or Fall 2024 MAP scores, or the District's Spring 2024 SBA scores. The IEP also did not include input from the Student's 8th grade teachers about her current progress, instead simply repeating comments from her 7th grade teachers. The IEP meeting also did not include the Student's current general education ELA teacher, who was simply told of the outcome of the meeting and did not provide input.

104.    All of these constituted procedural violations of the IDEA. WAC 392-172A-03090(1)(a). However, they did not impede the Student's right to FAPE, significantly impede the Parents' opportunity to participate in decision-making or cause a deprivation of educational benefits to the Student. WAC 392-172A-05105(2).

105.    At the October 2024 IEP meeting, the IEP team discussed the Student's current MAP scores, which reflected that the Student still read at a 3rd-4th grade level and that her Reading scores also steadily declined between Winter 2023-2024 to the Fall 2024, from a 201 (16th percentile) to a 196 (10th percentile). The IEP team also discussed that the Student had not improved in her Basic Reading, Reading Comprehension, Written Language and Math skills since implementation of the April 2024 IEP and 504 accommodations. The IEP team further discussed the Student's

June 2024 IEP Progress Reports, which reflected that the Student met only IEP goal, reading Blends/Digraphs at 4th grade level, but did not meet any of her other IEP goals in Reading Comprehension, Written Language or Math.

106.     While the October 2024 Amended IEP did not change any of the Student's goals from the April 2024 IEP, the Student had only received SDI for a few months. After considering her lack of progress, it was reasonable for the IEP team to include the same IEP goals from the April 2024 IEP, all of which focused on the Student's limitations as identified in the special education evaluation and identified specific measurable goals.  WAC 392-172A-03090(1)(b)(i).

107.     Further, the SDI offered in the October 2024 Amended IEP more closely aligned with Dr. Bode's recommendations. The Student's SDI in Reading Comprehension increased to 30 minutes/5 times per week, SDI in Basic Reading increased to 5 minutes/5 times per week to be delivered concurrent with Reading Comprehension, and SDI in Written Language increased to 25 minutes/5 times a week. Math SDI remained at 10 minutes per week, to be delivered in the general education setting, after the Student's math teacher indicated that this SDI would be sufficient for the Student.

108.     Finally, the October 2024 Amended IEP specified that the reading and writing SDI would now be delivered in a special education setting. The IEP team proposed this change based on the Student's declining test scores, her lack of improvement in these areas, and the conclusion that a special education setting could deliver her SDI with more 1:1 support. The SDI would be delivered by Ms. Schumacher, a teacher who has received training in dyslexia and has experience teaching dyslexic students. In contrast to General Education ELA classes with 26-30 students, Developmental ELA classes contain roughly 8 students receiving special education services. The class is co-taught with a paraeducator, and the general education curriculum is modified. While the class does not use a specific dyslexia-focused curriculum, it does utilize curricula which focuses on morphology of words, parts of words, and word syllables.

109.     The Parents argue that the District's decision to move the Student into the Developmental ELA was predetermined. PB44, 46. The Parents further emphasize that the District failed to offer the Student an existing Intervention ELA class that provided a dyslexic-based curriculum, "Read 180." PB29-42. I find both of these arguments unpersuasive.

110.     Predetermination occurs when the school district makes educational decisions too early in the process, in a way that deprives the parents of a meaningful opportunity to fully participate as equal members of the team.  *See Deal v. Hamilton County Board*

Findings of Fact, Conclusions of Law, and Final Order
Cause No.  2024-SE-0160
Docket No. 11-2024-OSPI-02405
8612 - OSPI
Page 70

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA  98504-2489
(800) 845-8830
(206) 587-5135

*of Education*, 392 F.3d 840, 857-859 (6th Cir. 2004).   Predetermination is a procedural violation of the IDEA.  *Ms. S. v. Vashon Island Sch. Dist.*, 337 F.3d 1115, 1131 (9th Cir. 2003).     However, predetermination is not synonymous with preparation.  The fact that a district may have come to a meeting with pre-formed opinions is not dispositive of the issue, so long as district team members "are willing to listen to the parents and parents have the opportunity to make objections and suggestions."  *Nack v. Orange City Sch. Dist.*, 454 F.3d 604, 610 (6th Cir. 2006) (*quoting N.L. v. Knox County Schs.,* 315 F.3d 688, 694 (6th Cir. 2003)).

111.    In this case, the District came to the October 2024 IEP meeting willing to listen to the Parents regarding their Student's educational needs, her progress, and the desire that she not be moved to Developmental ELA. However, the District properly concluded that as the Student had not made sufficient progress in her IEP goals, it was appropriate to both increase SDI and to move her to a setting where she would receive that SDI with more support. The District changed their decision to move the Student to Developmental Math class after her math instructor indicated that she could receive her SDI in the general education classroom. Therefore, I conclude that the District did not predetermine the Student's educational placement.

112.    As outlined above, the District was not required to provide a specific dyslexic-focused curriculum to the Student. Further, there was no evidence at hearing of any specific SDI offered or taught in the Intervention ELA class. Without this evidence, I cannot consider whether this class would have been appropriate for the Student. Thus, while it is unfortunate that the District never mention the existence of this class to the Parents until the hearing, there is no way to determine whether the Student's IEP could have been implemented in that setting.

113.    Based on these facts, I conclude that the October 2024 Amended IEP was reasonably calculated to enable the Student to make progress appropriate in light of her circumstances. *Endrew F*, 137 S. Ct. at 999. While District's October 2024 IEP process violated some IDEA procedural requirements, these violations did not result in a denial of FAPE and the October 2024 Amended IEP was reasonably calculated to enable the Student to make progress appropriate in light of her circumstances. The District has met its burden on this issue.

### Summary of Violations

114.    The District violated the IDEA and denied the Student a FAPE by:

      a. Failing to offer the Student an appropriate SDI in both the April 2024 and May 2024 Amended IEPs that was reasonably calculated to confer

Findings of Fact, Conclusions of Law, and Final Order
Cause No.  2024-SE-0160
Docket No. 11-2024-OSPI-02405
8612 - OSPI
Page 71

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA  98504-2489
(800) 845-8830
(206) 587-5135

meaningful educational benefit to the Student. (Issues 6 and 7) (Conclusion of Law (COL) 98).

115.  The District has proven by a preponderance of the evidence that it did not violate the IDEA or deny the Student FAPE in regard to any other issues alleged by the Parents.

116.  All arguments made by the parties have been considered. Arguments not specifically addressed have been considered but are found not to be persuasive or not to substantially affect a party's rights.

## Remedies

117.  When a district violates the IDEA, a tribunal may "grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C)(iii). Relief is "appropriate" if it furthers the purposes of the IDEA and helps to ensure that a student receives the education to which he was statutorily entitled at the time of the violation.  Ferren C. v. Sch. Dist. of Philadelphia, 612 F.3d 712, 719 (3d Cir. 2010).

### Compensatory Education

118.  Compensatory education is a remedy designed "to provide the educational benefits that likely would have accrued from special education services the school district should have supplied in the first place." *Reid v. Dist. of Columbia*, 401 F.3d 516, 524 (D.C. Cir. 2005), cited with approval in *R.P.*, 631 F.3d at 1125. "There is no obligation to provide day-for-day compensation for time missed. Appropriate relief is relief designed to ensure that the student is appropriately educated within the meaning of the IDEA." *Parents of Student W. v. Puyallup Sch. Dist*., 31 F.3d 1489, 1497 (9th Cir. 1994). Flexibility rather than rigidity is called for. *Reid v. Dist. of Columbia*, 401 F.3d at 523-24. Compensatory education is an equitable remedy, meaning the tribunal must consider the equities existing on both sides of the case. *Id.* at 524.

119.  A hearing officer may fashion individualized relief for students seeking compensatory education. As noted in *R.P.*:

> Courts have been creative in fashioning the amount and type of compensatory education services to award. See, e.g., *Ferren C. v. Sch. Dist. of Phila*., 612 F.3d 712, 718-19 (3d Cir. 2010) (court can order school to provide annual IEPs to student who had aged out of a statutory right to a FAPE); *M.S. ex rel. Simchick v. Fairfax Cnty. Sch. Bd*., 553 F.3d 315, 324-26 (4th Cir. 2009) (court can order that private school tuition

Findings of Fact, Conclusions of Law, and Final Order
Cause No.  2024-SE-0160
Docket No. 11-2024-OSPI-02405
8612 - OSPI
Page 72

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA  98504-2489
(800) 845-8830
(206) 587-5135

be reimbursed); *Park, ex rel. Park v. Anaheim Union High Sch. Dist*., 464
F.3d 1025, 1034 (9th Cir. 2006) (court can order additional training for
a child's teachers).

*R.P. v. Prescott*, 631 F.3d at 1126.

120.    The District's violations in this case delayed the Student's receipt of
appropriate SDI for fifteen school weeks, between implementation of the April 2024
IEP on May 3, 2024, and implementation of the October 2024 Amended IEP on
October 28, 2024. The April 2024 IEP was in place during for six weeks between May
3, 2024 through the end of the school year on June 17, 2024. The school year began
on September 3, 2024, but there is no evidence that the Student received any SDI
until the October 2024 Amended IEP was implemented on October 28, 2024.
Therefore, the Student received insufficient SDI for seven weeks during the 2023-
2024 school year, and no SDI for eight weeks during the 2024-2025 school year. A
full school year at the District is between 35-26 weeks.

121.    The evidence demonstrates that the Student has deficits in reading and
writing and requires SDI this area. It is therefore appropriate to provide compensatory
education to enable the Student to make up for that lost educational opportunity. The
Dyslexia on Demand program costs $14,933.00 per year. While it is unclear whether
these services would be comparable to what would be offered through SDI, the
Student has clearly benefitted from the tutoring and increased her reading abilities.
Based on these findings, I award compensatory education for half of one year cost, in
the amount of $7,466.50. Further, because the tutoring services could not have been
provided without assessments, administration costs and supplies, I additionally
award the following compensatory education costs: Initial Assessment ($200.00); half
of the Annual Assessment Year 1 ($100.00); half of the Progress Reporting for Year
1 ($50.00);  Initial Materials ($154.00); IEP representation for Year 1 ($75.00); half
of the invoices for one year ($30.00). This results in total compensation to the Parents
of $8,075.50.

122.    The evidence demonstrates that reimbursement to Dyslexia on Demand is
appropriate because it specializes in serving students with reading difficulties, and all
tutors are trained in providing appropriate reading interventions, and the Student
made progress in reading through their program.

123.    Although a compensatory award of private services is sometimes reduced to
account for the fact that students generally progress more rapidly with one-on-one
instruction as opposed to instruction in a classroom, it is not appropriate to reduce
the award in this case. The evidence establishes the importance of timely intervention

to address reading and writing deficits and the Student's need for 1:1 or small group SDI. Because the Student is in middle school, time is of the essence in building these skills. Accordingly, the award is not reduced.

**IEP Team Meeting**

124.    Within thirty calendar days of this order, the District shall convene the Student's IEP team at a mutually agreeable time with the Parents. The District shall ensure that a general education ELA teacher attends the meeting in addition to the other required members of the Student's IEP team. The team shall review the Student's access to the general education classroom and curriculum in addition to any issues identified by the IEP team members. The team shall consider the appropriate ELA class for the Student, including consideration of placing the Student in an Intervention ELA class or similar setting for the 2025-2026 school year. The IEP team meeting shall comply with all regulations at WAC 392-172A-03090 through 392-172A-03115.

<u>ORDER</u>

1.      The District violated the Individuals with Disabilities Education Act and denied the Student a free appropriate public education as set forth in Conclusion of Law 98.

2.      The Parents are entitled to the remedies laid out in Conclusions of Law 121, 122, 123, and 124.

3.      The Parents' remaining requested remedies are denied.

SERVED on the date of mailing.

_____
L'Nayim Shuman-Austin
Administrative Law Judge
Office of Administrative Hearings

Findings of Fact, Conclusions of Law, and Final Order
Cause No.  2024-SE-0160
Docket No. 11-2024-OSPI-02405
8612 - OSPI
Page 74

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA  98504-2489
(800) 845-8830
(206) 587-5135

## Right To Bring A Civil Action Under The IDEA

Pursuant to 20 U.S.C. 1415(i)(2), any party aggrieved by this final decision may appeal by filing a civil action in a state superior court or federal district court of the United States. The civil action must be brought within ninety days after the ALJ has mailed the final decision to the parties. The civil action must be filed and served upon all parties of record in the manner prescribed by the applicable local state or federal rules of civil procedure. A copy of the civil action must be provided to OSPI, Legal Services, PO Box 47200, Olympia, WA 98504-7200. To request the administrative record, contact OSPI at appeals@k12.wa.us.

DECLARATION OF SERVICE

I declare under penalty of perjury under the laws of the State of Washington that true copies of this document were served upon the following as indicated:

Parents                                        via E-mail
19501 W Tapps Dr E                             padacanay@hotmail.com
Bonney Lake, WA  98391                         katydacanay@gmail.com

Rachel Sugar                                   via E-mail
Elicia Johnson                                 rachel@cedarlawpllc.com
Cedar Law PLLC                                 elicia@cedarlawpllc.com
600 1st Ave Ste 330                            emma@cedarlawpllc.com
PMB 96563                                      levi@cedarlawpllc.com
Seattle, WA  98104                             chloe@cedarlawpllc.com

Karen Finigan                                  via E-mail
Executive Director of Special Services         karen_finigan@sumnersd.org
Sumner-Bonney Lake School District
1202 Wood Ave
Sumner, WA  98390

Susan Winkelman                                via E-mail
Pacifica Law Group LLP                         susan.winkelman@pacificalawgroup.com
401 Union St., Suite 1600                      grace.mcdonough@pacificalawgroup.com
Seattle, WA  98101

Dated June 13, 2025, at Olympia, Washington.

*Lan Le*
_____
Representative
Office of Administrative Hearings
P.O. Box 42489
Olympia, WA  98504-2489

cc:    Administrative Resource Services, OSPI